UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:19CR220 (VAB) |
| | : | |
| v. | : | August 12, 2021 |
| | : | |
| DERON FREEMAN | : | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S PRETRIAL
MOTION [Doc. #42] FOR A BILL OF PARTICULARS

The United States submits this response to the defendant's pretrial motion for a bill of

particulars [Doc. # 42] regarding the methodology used to establish an accurate assessment of the

defendant's yearly gross receipts, net profit, and taxable income[1] in the upcoming tax trial of the

defendant.  The Government respectfully submits that the motion for bill of particulars is moot

and should be denied in light of previously provided formal and informal discovery regarding the

Government's proof, including prior discussions with defense counsel and prior disclosure of

spreadsheets in draft form regarding determinations of tax loss,[2] the detailed information provided

---

1  **"Gross receipts"** are reflected on **line 1(d)** of the 2011 Schedule C and line 1 of the 2012 and
2013 Schedules C, appended to the respective Form 1040, and, in the context of the filings of the
defendant's 2011, 2012 and 2013 Forms 1040, reflect the receipts/income earned by the
defendant's law firm (approximately 1/3 of the gross proceeds paid in settlement checks plus
additional fees paid by clients) *after* required payouts to a client on a personal injury case or on
client-related expenses.
    **"Net Profit"** is reflected on **line 31** of the Schedule C and line 12 of the Form 1040, and
reflects the net income earned by the defendant's law firm *after* deducting all firm-related
expenses.
    **"Taxable income"** is reflected on **line 43** on the Form 1040 reflects the final personal taxable
income upon which federal taxes are owed *after* personal deductions.

2  On May 24, 2018, the Government met with defense counsel to discuss tax loss calculations and
the theory of its case and provided informal discovery including IRS transcripts for tax years
2007-2010, and a summary of bank accounts analyzed and overall balance information.
    On January 24, 2019, the Government met with defense counsel again to discuss tax loss
calculations and the theory of its case and provided informal discovery in the form of drafts of the

1

by this Response and the anticipated meeting on August 26, 2021, with defense counsel, to further discuss the methodology, as well as any agreements.[3]

As the Court is aware, the defendant is charged with three counts of filing false returns for the 2011 through 2013 tax years and willful failure to pay income taxes due for the 2012 through 2015 tax years.  *See* Superseding Indictment [Doc. # 37].  As will be developed further at trial, from the period 2010 until 2016, the defendant engaged in a spendthrift lifestyle, using his own considerable income and money loaned to him by his brother to purchase land and construct an expensive custom home for himself, to buy or lease multiple expensive cars and boats, and to live

---

following work product as of January 7, 2019:  Appendix A (Summary of Tax Due and Owing, including attachments A-1, A1-1, A-1-2, A-1-3); Appendix B (Summary of Proceeds from Insurance Companies Compared to Payments to Deron Freeman from IOLTA Accounts, including Appendix B-1 and B-2); Appendix C (Summary of Deron Freeman's Personal Expenses, including Appendix C-1, C-2); and Appendix D (Summary of Return Filing Dates and Calculation of Tax Due at Time Return was Filed, including Appendix D-1 (tax balances)).

On July 3, 2018, the Government informally provided additional discovery to defense counsel which included copies of the IRS transcripts for Deron Freeman for tax years 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

In its initial discovery production in this case on September 24, 2019, the Government produced bank account discovery for People's United Bank, Webster Bank, and other bank accounts, insurance company records, IRS records including the IRPs (discussed in detail below), the Revenue Agent Report ("RAR"), filed tax returns and tax transcripts for 2010 through 2015, and documents from over a dozen subcontractors who worked on Freeman's house, including other documents.

On July 21, 2021, drafts as of 7/15/2021 of Appendices A and B (and supporting documentation) were provided again to defense counsel.

[3] A bill of particulars is not a device for discovery or one by which the government is required to state its legal or evidentiary theory as to how a defendant committed specific criminal acts. *See United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974).  A bill of particulars "is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means," and the decision to grant a request for a bill of particulars rests within the sound discretion of the district court.  *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).  The Second Circuit held that the district court "has the discretion to deny a bill of particulars if the information sought is provided in the indictment or in some acceptable alternate form."  *United States v. Barnes*, 158 F.3d 662, 664-665 (2d Cir. 1998) (citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

well beyond his means. The evidence will establish that the defendant engaged in a continuing pattern of illegally deferring and denying his legitimate tax obligations, despite the plain resources to meet them.

As evidence of this pattern, when the IRS approached the defendant in 2010 to obtain from the defendant taxes he owed but had yet to pay, the defendant began parking hundreds of thousands of dollars of his income in a friend's bank account. The defendant then turned to stashing attorney's fees he had earned in an IOLTA account that he did not disclose to the State Grievance Committee as he was required to do. This consistent pattern of tax avoidance continued with his subsequent failures to file timely tax returns, failures to timely pay his taxes for the 2012 through 2015 tax years, and the late filing of tax returns for 2011 through 2013 that markedly understated his gross receipts, his net profit and his taxable income, and ultimately taxes owed.

I.      **Freeman's Attorney's Fees and Use of Various Bank Accounts**

A.      **Freeman's Bank Accounts**

Information about Freeman's use of multiple bank accounts and the sources of his income is important background for the discussion of how the Government calculated his unreported gross receipts. As an attorney licensed in the State of Connecticut, Freeman was required to register each IOLTA into which the funds of more than one client were kept with the Statewide Grievance Committee. On or about February 18, 2005, Freeman registered with the Statewide Grievance Committee an IOLTA he maintained in the name of his law firm at Webster Bank, account number ending in 5719 (the "Webster IOLTA"). Thereafter, Freeman continued to register the Webster IOLTA each year with the Statewide Grievance Committee until January 2021. Freeman deposited gross receipts from insurance settlement checks into the Webster IOLTA in 2011, 2012, and 2013.

Freeman maintained another IOLTA at People's United Bank, account number ending in 4379 (the "Undisclosed People's IOLTA"), but did not disclose the existence of that account to the Statewide Grievance Committee or disclose to the IRS that over $2,000,000 was deposited into the account in 2012 and 2013.

Freeman also maintained an operating account at Webster Bank, account number ending in 5726 (the "Webster Operating Account), a personal checking account at People's United Bank, account ending in 6605 (the "People's Personal Account"), and controlled money in an account in the name of a third party, J.O., at People's United Bank, account ending 6667 (the "J.O. Nominee Account").  The following table lists these five accounts and the years in which deposits of Freeman's gross receipts were made into them:

| Bank | Account Name | Account Type | Account # (last 4) | Deposit Years |
|------|--------------|--------------|--------------------|---------------|
| Webster Bank | Attorney Deron D. Freeman ("Webster IOLTA") | IOLTA | 5719 | 2011 2012 2013 |
| People's United Bank | Attorney Deron D. Freeman ("Undisclosed People's IOLTA") | IOLTA | 4379 | 2012 2013 |
| Webster Bank | Law Offices of Deron D. Freeman ("Webster Operating Account") | Operating | 5726 | 2011 2012 2013 |
| People's United Bank | Deron D. Freeman ("People's Personal Account") | Personal checking | 6605 | 2011 2012 2013 |
| People's United Bank | J.O. ("J.O. Nominee Account") | Personal checking | 6667 | 2011 2012 |

B.    **Sources of Freeman's Gross Receipts**

In 2011, 2012, and 2013, Freeman earned most of his income from the practice of personal injury law, receiving income in the form of settlement checks issued by various insurance companies for personal injury cases.  Those settlement checks were deposited into the Webster IOLTA or the Undisclosed People's IOLTA, and Freeman disbursed money from his IOLTAs to pay the client's portion of the settlement and various expenses.  Freeman also disbursed

approximately one-third of the total settlement amount as his attorney's fee in the form of checks, cash withdrawals, transfers to personal bank accounts, and the payment of his personal expenses.

In addition to personal injury cases, Freeman performed other legal work (e.g., criminal cases) for which he received fees in the form of checks or payments from third party payment processors (e.g., Global Pay, which allowed clients to pay by credit card). The fees Freeman earned outside of personal injury cases represented less than 8% of Freeman's gross receipts and were deposited directly into the J.O. Nominee Account, the People's Personal Account, or the Webster Operating Account.

## II.     **Theories of Prosecution**

### A.     **False Return Counts**

As relevant to the defendant's motion for bill of particulars, the Government will seek to prove the true gross receipts, net profit and taxable income that should have been included on the defendant's tax returns through a hybrid "specific items/bank deposits" method and a separate "specific items" method (both discussed below). To better understand the reason for the Government's chosen approach, it is helpful to focus on the proof necessary to convict the defendant of one or more of the charged counts.

The Superseding Indictment includes three felony counts of filing false tax returns, for the 2011, 2012 and 2013 tax years. Section 7206(1) makes it a felony to willfully make and subscribe a false document, if the document was signed under penalties of perjury. "[T]he primary purpose of section 7206(1) 'is to impose the penalties of perjury upon those who willfully falsify their returns regardless of the tax consequences of the falsehood.'" *United States v. Romanow*, 509 F.2d 26, 28 (1st Cir. 1975) (*quoting Gaunt v. United States*, 184 F.2d 284, 288 (1st Cir. 1950)). The Government need not establish that the defendant failed to pay taxes – simply that he willfully

filed a return that contained one or more materially false statements. *See United States v. Scholl*, 166 F.3d 964, 979 (9th Cir.1999); *United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998); *United States v. Minneman*, 143 F.3d 274, 279 (7th Cir. 1998).[4]

"[A] 'material' matter is one that affects or influences the IRS in carrying out the functions committed to it by law *or* 'one that is likely to affect the calculation of tax due and payable.'" *United States v. Griffin*, 524 F.3d 71, 76 (1st Cir. 2008) (citations omitted). Materiality is not difficult to establish in a false return case. Indeed, "[a] false statement may be material even if it was only *likely to influence the calculation* of tax due and payable." *Id*. at 76-77 (emphasis in original).[5] Unlike a charge of tax evasion that requires the government prove a tax loss in a given year, failure to accurately disclose gross receipts, as the defendant failed to do here,[6] is material because an accurate gross receipts number is centrally important for the accurate assessment of tax. *United States v. Holladay*, 566 F.2d 1018, 1020 (5th Cir. 1978) (*per curiam*), *United States v. Morse*, 491 F.2d 149, 157 (1st Cir. 1974); *United States v. Engle*, 458 F.2d 1017, 1019-20 (8th Cir. 1972). *United States v. Hedman*, 630 F.2d 1184, 1196 (7th Cir. 1980); *United States v. Taylor*,

---

[4] The government is not required to prove that the defendant intended to induce the government to rely on his or her false statement or that the government was actually deceived. "[T]he intent to induce government reliance on a false statement or to deceive the government is *not* an element of 26 U.S.C. § 7206(1)." *United States v. Griffin*, 524 F.3d 71, 81 (1st Cir. 2008) (emphasis original) (*citing United States v. Boulerice*, 325 F.3d 75, 79-80 (1st Cir. 2003)).

[5] To convict a defendant, the government need only prove that one of the false items is false. *See, e.g., Griffin v. United States*, 502 U.S. 46, 51 (1991) (when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient as to any one of the acts charged).

[6] In the present case, the Government will use the term **"gross proceeds"** to reflect settlement payments paid by insurance companies which were then deposited into the Webster IOLTA and the Undisclosed People's IOLTA. The term **"gross receipts,"** as used on the Forms 1040 for the defendant's 2011, 2012 and 2013 returns, refers to the share of gross proceeds and other attorney's fees paid directly to the defendant or his firm that constituted income to the defendant's law firm, an amount reflected on the Schedule C as described in footnote 1.

574 F.2d 232, 235-36 (5th Cir. 1978); *United States v. Taylor*, 574 F.2d 232, 236 (5th Cir, 1978) (proof of unreported gross receipts was sufficient to sustain a conviction in a false return case, rejecting contention that government need prove up gross income or tax liability).

The Government has alleged in each of the false return counts that the defendant materially understated his actual gross receipts, net profit and taxable income for the given tax year. To prove the understatement of "gross receipts" in this case, the Government will employ two different methods, a specific items analysis based on IRS "IRP" records and a hybrid specific items/bank deposit analysis based on a review of the defendant's bank records, with both methods discussed below. The latter analysis results in greater exactness of the final figures, but requires more evidentiary proof. Ultimately, the Court in evaluating the materiality of the alleged falsehood of gross receipts, net profit or taxable income may determine that it need not reach the more detailed method of proof to conclude that the return for a given tax year contains one or more instances of materially false information. *See United States v. Nunan*, 236 F.2d 576, 585 (2d Cir. 1956) (finding sufficient evidence on specific items theory without needing to reach bank deposits analysis).

### B. Failure to Pay Counts

The Superseding Indictment also includes four misdemeanor counts, charging the failure to timely pay taxes due for the tax years 2012, 2013, 2014, 2015 – Counts Three, Five, Six, and Seven, respectively. These counts simply require the Government establish a basic level of taxes due and owing for a given tax year that the defendant willfully failed to pay at the time required by law. *Sansone v. United States*, 380 U.S. 343, 351 (1965).[7] Here, the defendant has already

---

[7] A defendant's past taxpaying history is admissible to prove willfulness circumstantially. *United States v. Bok*, 156 F.3d 157, 165 (2d Cir. 1998) ("[a]s we have often explained, a defendant's past taxpaying record is admissible to prove willfulness circumstantially"); *United States v. Schiff*, 612

admitted with the filing of tax returns for each of the years at issue that there were significant taxes

owed each year, although at least for 2012 and 2013 the actually filed false returns reported

substantially less taxes than the defendant actually owed.[8]  It will likely be undisputed that, for

each tax year at issue in the failure to pay counts (2012, 2013, 2014 & 2015), the defendant had

not paid to the IRS *any* withholding taxes by the relevant due date for payment in mid-April, as

required by law.  This failure to pay was not because the defendant lacked resources to pay, but

rather because he instead chose to spend tens (or in some years hundreds) of thousands of dollars

of his income, over and above any loans he had received from his brother, on personal expenses,

buying/leasing cars, boats and other items and constructing an expansive custom residence.[9]  The

fact of these personal expenditures themselves make clear that the defendant was earning

---

F.2d at 77-78 (2d Cir. 1979); *United States v. Magnus*, 365 F.2d 1007, 1011 (2d Cir. 1966) (prior taxpaying history, both federal and state, can be probative of a taxpayer's willfulness in failing to pay substantial amounts of federal taxes in the years at issue); *see United States v. Daraio*, 445 F.3d 253, 264 (3d Cir. 2006).

[8] The government "may take the taxpayer's reported income as an admitted amount earned from designated sources" and need not corroborate this reported income.  *United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974).  Corroboration is not required because the statements in the defendant's return constitute pre-offense admissions and pre-offense admissions do not have to be corroborated. *Warszower v. United States*, 312 U.S. 342, 347 (1941); *see United States v. Pennell*, 737 F.2d 521, 536-37 (6th Cir. 1984) (narcotics and firearms); *United States v. Soulard*, 730 F.2d 1292, 1298 (9th Cir. 1984) (use of credit application to establish cash on hand); *see also United States v. Marshall*, 863 F.2d 1285, 1290-91 (6th Cir. 1988) (Krupansky, J., dissenting). Similarly, in most cases, the government can rely on the deductions and expenses claimed on the defendant's tax return to prove the statutory offsets to gross income.  Deductions claimed on a tax return are admissions and can be used to make a prima facie case.  Fed. R. Evid. Rule 801(d)(2); *United States v. Northern*, 329 F.2d 794, 795 (6th Cir. 1964).

[9]  Willfulness does not require the government to prove that the taxpayer had the financial ability to pay his or her taxes when they came due, although the defendant in this case plainly had the ability to pay.  *United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2008).  The intent to report and pay taxes due at some time in the future does not constitute a defense and "does not vitiate" the willfulness required for a failure to file or, for that matter, for an attempt to evade. *Sansone v. United States*, 380 U.S. 343, 354 (1965).

substantial monies on which he plainly owed taxes; and that he had the immediate resources to pay the taxes he owed – if he weren't otherwise spending them on his many personal items. In short, the defendant each year simply made a choice not to pay taxes on time, as required. The Government respectfully submits that a detailed analysis of the defendant's financial circumstances is not necessary to establish the charges for the defendant's willful failure to timely pay taxes owed. However, the analysis does offer some corroborative evidence that the defendant had a sizable tax obligation that had accrued each tax year that he was not paying in a timely manner, despite having access to the resources to do so.

III.    **Recognized Methods of Establishing Gross Receipts, Net Profit, and Taxable Income**

    A.    **Specific Items Method of Proof**

The caselaw recognizes various methods the government may use to establish a sufficient picture of the defendant's financial circumstances each year to demonstrate that the defendant's filed tax returns were materially false as to gross receipts, as well as to down-the-return items such as net profit and taxable income. The most frequently adopted method of proof is the "specific items" approach by which the government proves each specific item it seeks to classify as gross receipts. The specific items approach differs from indirect methods of proof (for example, the "bank deposits method" discussed below), in that "specific items" focuses on specific financial transactions and does not attempt to reconstruct the defendant's overall financial situation in order to draw inferences from that broader picture.

The "specific items" method primarily relies on direct evidence, although circumstantial evidence may also be used. *See, e.g.*, *United States v. Marcus*, 401 F.2d 563, 565 (2d Cir. 1968) (defendant's income from check cashing service determined by multiplying standard check fee by amount of checks cashed). Evidence establishing a particular item as income may include

admissions of the defendant, bank records, testimony of inside witnesses (*e.g.*, the defendant's employees), testimony and documentation of witnesses engaged in the transactions that have been reported inaccurately, defendant's books and records, and testimony of the defendant's accountant. The government usually attempts to produce evidence that the defendant received income that was either not shown at all on the return or underreported on the return. *United States v. Citron*, 783 F.2d 307, 315 (2d Cir. 1986) (proof of unreported income is "sufficient" if it shows that the amounts of unreported income were substantial); *United States v. Martin*, 525 F.2d 703, 707 (2d Cir. 1975) (government need to show unreported taxable income, but did not need establish how that income had been spent).

In this case, the Government will establish that the defendant's total gross receipts, net profit and taxable income were materially higher than what the defendant reported on his tax returns. It is not necessary to show which particular item was not reported on the return, simply that the total actual gross receipts or net profit were materially greater than reported. *See*, *e.g.*, *United States v. Marabelles*, 724 F.2d 1374, 1378 & n.2 (9th Cir. 1984) (government proved gross receipts from defendant's painting business substantially in excess of reported amounts); *United States v. Horton*, 526 F.2d 884, 886 (5th Cir. 1976) (amount of legal fees testified to by attorney-defendant's clients exceeded legal fees reported).

B.      **The Bank Deposits Method of Proving Gross Receipts/Net Profit, Taxable Income**

For a limited number of specific check items, it might be more difficult for the Government to establish the character of the item by use of the "specific items" method alone. For example, in this case, because the defendant has hundreds of clients and receives settlement checks from dozens of insurance companies, it would be impractical to call every single insurance company or law firm client to establish that a particular check constitutes attorney's fees to

Freeman. Thus, the law allows an indirect method of proof to draw reasonable inferences from background information to determine the nature of payments and provide a more complete picture of the defendant's financial condition. One such method is referred to as the "bank deposits method" of proof which looks at all the deposits to the defendant's bank accounts in the context of an ongoing business.

The government may use the "bank deposits" method of proof in conjunction with the "specific items" method within the same case.[10] For example, in *United States v. Procario*, 356 F.2d 614, 616 (2d Cir. 1966) ("The government relied for proof partly on direct evidence from patients and their cancelled checks, and partly on the bank deposit method, modified so as to yield the rest of appellant's professional income."); *see also United States v. Nunan*, 236 F.2d 576, 582, 586 (2d Cir. 1956). Indeed, the government routinely uses "specific items" method of proof for some items, and the "bank deposits" method for others, all within the same case. *See, e.g., United States v. Tafoya*, 757 F.2d 1522, 1528 (5th Cir. 1985); *United States v. Horton*, 526 F.2d 884, 886-87 (5th Cir. 1976); *Canton v. United States*, 226 F.2d 313, 322-23 (8th Cir. 1955); *United States v. Smith*, 890 F.2d 711, 717 (5th Cir. 1989) (part of income proven by specific items and part proven by bank deposits); *United States v. Citron*, 783 F.2d 307, 310 & n.4 (2d Cir. 1986); *United States v. Lacob*, 416 F.2d 756, 759-60 (7th Cir. 1969) (bank deposits and specific items); *United States v. Bahr*, 580 F. Supp. 167, 170 (N.D. Iowa 1983) (bank deposits and specific items, with a percentage computation to calculate cost of goods sold).

---

[10] The bank deposits method of proof was approved in *Gleckman v. United States*, 80 F.2d 394, 399-401 (8th Cir. 1935). Since that time, the bank deposits method of proof has "received consistent judicial approval." *United States v. Morse*, 491 F.2d 149, 151 (1st Cir. 1974); *see also United States v. Slutsky*, 487 F.2d 832, 840 (2d Cir. 1973); *United States v. Nunan*, 236 F.2d 576, 587 (2d Cir. 1956).

The bank deposits method relies on the inference that, when an individual has an ongoing business, substantial deposits in excess of reported amounts represent additional unreported receipts or income. *United States v. Slutsky*, 487 F.2d 832, 840 (2d Cir. 1973). The threshold requirement, not in dispute in this case, is that the defendant was engaged in a business from which the fact finder can infer that unreported income might arise, namely, a personal injury law practice. *Gleckman v. United States*, 80 F.2d 394, 399 (8th Cir. 1935); *United States v. Lacob*, 416 F.2d 756, 758 (7th Cir. 1969) (personal injury attorney); *United States v. Nunan*, 236 F.2d 576, 579 (2d Cir. 1956) (attorney, politician, and former Commissioner of Internal Revenue). The government must then present evidence to draw reasonable inferences regarding deposits made and make an adequate and full investigation into those accounts to distinguish between income and non-income deposits. *Gleckman*, at 399. As explained in *United States v. Boulet*, 577 F.2d 1165, 1167 (5th Cir. 1978):

> Under this method, all deposits to the taxpayer's bank and similar accounts in a single year are added together to determine the gross deposits. An effort is made to identify amounts deposited that are non-taxable, such as gifts, transfers of money between accounts, repayment of loans and cash that the taxpayer had in his possession prior to that year that was deposited in a bank during that year. This process is called "purification." It results in a figure called net taxable bank deposits.

*See Slutsky,* 487 F.2d at 840 (upholding use of bank deposits method where the government established substantial deposits in excess of reported income).[11]

---

[11] Although the government may also look outside the banking activity to identify other income (for example, if the defendant were paid in cash for services rendered and then purchased an item with that cash without depositing the funds in a bank), the conservative analysis adopted below does not include such income and thus may understate the defendant's true income. Instead, the Government limited the analysis to identifiable banking activity with non-cash disbursements to the defendant and non-cash deposits to bank accounts the defendant either owned or controlled. Thus, the requirement that the Government establish the amount of cash the defendant had on hand at the start of the prosecution period to avoid mischaracterizing cash deposits as income, does not (and could not) apply. *United States v. Riggen*, 51 F.3d 283 (9th Cir. 1995), 1995 WL139219, *1-2 (finding proof of cash on hand "not necessary in this case," where analysis "did not rely on cash deposits to reconstruct" the defendant's gross income). *Cf. United States v. Moore*, 498 Fed. Appx. 195, 208 (4th Cir. 2012) (affirming government conservative analysis that

As part of the adequate and full investigation of the accounts, the Government characterized items as receipts/income/etc., based on reasonable inferences, looking at the character and size of deposits, the apparent sources of the checks, the manner of the deposits, and other information. *United States v. Slutsky*, 487 F.2d 832, 841-42 (2d Cir. 1973); *See United States v. Abodeely*, 801 F.2d 1020, 1023 (8th Cir. 1986); *United States v. Stone*, 770 F.2d 842, 844 (9th Cir. 1985); *United States v. Helina*, 549 F.2d 713, 720 (9th Cir. 1977); *United States v. Morse*, 491 F.2d 149, 152 (1st Cir. 1974); *United States v. Venuto*, 182 F.2d 519, 521 (3d Cir. 1950).[12] Ultimately, the question "is whether the government's investigation has been sufficiently adequate to support the inference that the unexplained excess in receipts was in fact attributable to currently taxable income." *United States v. Slutsky*, 487 F.2d 832, 841-842 (2d Cir. 1973). However, the Government is not required "to negate all possible non-income sources of the deposits" nor prove "the exact amount of the understatement." *Id.* Rather, *"[o]nce the Government proves unreported receipts having the appearance of income*, and gives the defendant credit for the deductions he claimed on his return, as well as any others it can calculate without his

_____

did not include personal cash expenditures outside of deposits as income). Further, there is no evidence or reasonable inference that the defendant, who had child support obligations and was living beyond his means, had a material cash-on-hand that would be relevant to the analysis. And defense counsel has not suggested a cash hoard existed or would impact the Government's analysis in any way. *See United States v. Ludwig*, 897 F.2d 875, 881 (7th Cir. 1990) (sufficient investigation and pursuit of all reasonable leads suggested by the defendant met requirement of assessing cash on hand).

[12] In *United States v. Lacob*, 416 F.2d 756, 758 (7th Cir. 1969), the court upheld as adequate an investigation involving total deposits of $99,000 in one year by a lawyer who specialized in personal injury claims and received fees of 20% or 33$^{1/3}$% of the recovery obtained, depending on whether the case was a worker's compensation claim or a personal injury claim. There was approximately $39,000 in unidentified and unexplained checks deposited. The defendant was charged with income equal to 20% of these checks, based on the assumption, in the absence of other proof, that these were the proceeds of the defendant's cases and that his fee was the lower of the two fee bases he used.

assistance, *the burden is on the defendant to explain the receipts, if not reportable income*, and to prove any further allowable deductions not previously claimed." *Slutsky,* 487 F.2d at 842 (emphasis in original).

Because the inferences adopted in a bank deposit analysis are strengthened by establishing specific items as receipts or income, the government will often employ a hybrid analysis, using both the specific items method to firmly establish certain deposits as receipts/income and then rely on the inferences of a bank deposits analysis to establish the remainder of the items as receipts/income.[13]

For example, in *United States v. Nunan*, 236 F.2d 576 (2d Cir. 1956), the government used both specific items and bank deposits evidence. The Second Circuit affirmed based on the specific items proof alone without ever reaching the bank deposits analysis, noting that "proof relative to the specific items of taxable income which were omitted from the returns in the light of the evidence as a whole was of itself sufficient to support the verdict." *Nunan,* 236 F.2d at 586.

---

[13] In one case involving three years of criminal conduct, the government could prove unreported income in the first year by the "specific items" method, while proving unreported income for the next two years by the "net worth" method. *United States v. Dawson*, 400 F.2d 194, 203 (2d Cir. 1968). Additionally, both direct and indirect methods can be used for the same year. *See United States v. Scott*, 660 F.2d 1145, 1147-48 (7th Cir. 1981) (specific items and net worth); *United States v. Rodriguez*, 545 F.2d 829, 832 (2d Cir. 1976) (specific items and expenditures methods); *see also United States v. Hart*, 70 F.3d 854, 860-61 (6th Cir. 1995) (specific items and expenditures methods); *United States v. Smith*, 890 F.2d 711, 717 (5th Cir. 1989) (part of income proven by specific items and part proven by bank deposits); *United States v. Citron*, 783 F.2d 307, 310 & n.4 (2d Cir. 1986); *United States v. Meriwether*, 440 F.2d 753, 755-56 (5th Cir. 1971) (net worth and specific items); *United States v. Lacob*, 416 F.2d 756, 759-60 (7th Cir. 1969) (bank deposits and specific items); *Chinn v. United States*, 228 F.2d 151, 153-54 (4th Cir. 1955) (net worth and specific items for one year, specific items alone for another year); *United States v. Bahr*, 580 F. Supp. 167, 170 (N.D. Iowa 1983) (bank deposits and specific items, with a percentage computation to calculate cost of goods sold).

**IV.    Methodology Used in Calculating Unreported Gross Proceeds**

The Government uses two approaches to determine the amount of Freeman's unreported income.  The first approach is a highly detailed examination of disbursements and deposits using a hybrid of the "specific items" approach and the "bank deposits" method.  The second approach is a straightforward "specific items" approach based on Form 1099-MISC monies paid to Freeman.  Although the second approach understates Freeman's gross receipts because it includes only Freeman's Form 1099-MISC income reported to the IRS, it nonetheless establishes and further confirms the materiality of Freeman's underreporting of gross receipts, net profit, and taxable income.

**A.    <u>Disbursements and Deposits Approach</u>**

The hybrid approach examines disbursements and deposits – specifically, disbursements to Freeman from the IOLTA bank accounts and deposits to other non-IOLTA bank accounts that Freeman controlled.

**1.    IOLTA Disbursements**

The settlement checks reported on Forms 1099-MISC were deposited into the Webster IOLTA or into the Undisclosed People's IOLTA and the defendant took attorney's fees from those cases by way of 645 separate disbursements from the IOLTAs in 2011, 2012 and 2013.  Those IOLTA disbursements are listed on Appendices A-1-1 and A-1-2 and came in four different forms: 1) checks to Freeman from the Webster IOLTA; 2) checks to Freeman from the Undisclosed People's IOLTA; 3) transfers from the IOLTAs to the Webster Operating Account; and 4) personal expenses paid directly out of the Webster IOLTA.

**Checks to Freeman from the Webster IOLTA:**  Freeman and his former office manager D.S. (formerly D.G.), who worked at Freeman's law firm from approximately 2010 to 2013 told

the IRS that Freeman took his attorney's fees in personal injury cases in the form of checks written to himself from the IOLTAs. *See* Government Exhibit ("GX")[14] 19 at ¶¶ 20-21; GX 20A at ¶¶ 6-7; GX 20B at ¶¶ 9-11. This is plainly apparent from the checks themselves. For example, settlement check #13082157 issued by 21st Century North America Insurance Company in the amount of $14,500 payable to "Deron D. Freeman DBA Law Offices of Deron Freeman & 'B.J.'" was deposited into the Webster IOLTA on January 28, 2011. GX 3. Freeman took his attorney fees from that settlement (a 33.4% share) by way of check 3895, payable to Deron Freeman, dated February 2, 2011 for $4,842.29 with a memo line "B.J." *See* GX 4, GX 1 (App. A-1-1 at 2), GX 2 (App. B-1 at 1). Nearly 94% of the checks payable to Deron Freeman are traceable in this manner to particular insurance company settlement checks that had earlier been deposited into the Webster IOLTA (and reported to the IRS on a form called the "IRP" (explained in detail below at section IV.B.)). Additional examples of these check pairings – insurance checks into the Webster IOLTA and disbursements to Freeman out of the IOLTA) – are set forth in GX 7. In 2011, 2012 and 2013, a total of $963,570 in checks were cut from the Webster IOLTA payable to Deron Freeman as attorney's fees for personal injury cases.

**Checks to Freeman from the Undisclosed People's IOLTA:** Similar to how Freeman drew attorney's fees from the Webster IOLTA, during 2012 and 2013, Freeman drew 152 checks representing attorney's fees on personal injury cases payable to himself from the Undisclosed People's IOLTA. Just like the disbursements from the Webster IOLTA, the checks from the Undisclosed People's IOLTA are plainly attorney's fees for personal injury settlements received from insurance companies. For example, settlement check #82741219 issued by The Travelers in

---

[14] The Government is filing GX 10, 19, 20A, 20B and 21 concurrently in redacted form. The other exhibits referenced herein are being filed under seal as they are not reasonably susceptible to redaction.

the amount of $30,000 payable to "Law Offices of Deron Freeman and "A.D.F." was deposited

into the Undisclosed People's IOLTA on July 24, 2012.  GX 5.  Freeman took his attorney fees

from that settlement (a 33.3% share) by way of check 1143, payable to Deron Freeman, dated

July 30, 2012 for $9,990.00 with a memo line "A.D.F." *See* GX 6, GX 1 (App. A-1-2 at 2), GX 2

(App. B-1 at 20).  Over 96% of the checks payable to Deron Freeman from the Undisclosed

People's IOLTA are traceable in this manner to particular insurance company settlement checks

that had earlier been deposited into that account (and reported on the IRP).  Additional examples

of these check pairings – insurance checks into the IOLTA and disbursements to Freeman out of

the IOLTA) – are set forth in GX 8.  The total of checks disbursed to Deron Freeman from the

Undisclosed People's IOLTA for 2012 and 2013 is $684,928. GX 1 (App. A-1).

**Transfers from IOLTAs to the Webster Operating Account:**  In addition to checks

drawn from the IOLTAs, Freeman told agents that he also took his fees in the form of banking

transfers from the IOLTAs to the Webster Operating Account.  GX 19 at ¶ 21.  That too is plainly

evident from the bank accounts.[15]  In 2011, 2012, and 2013, there were a total of 151 direct

transfers from the Webster IOLTA primarily to the Webster Operating Account totaling $304,925,

the entirety of which was included as gross receipts to Freeman.  GX 1 (App. A-1, App. A-1-1 at

1-2 (2011 transfers); 5-6 (2012 transfers); 7-8 (2013 transfers)).

**Personal Expenses:**  From June 20, 2013 to December 9, 2013, Freeman made 48

payments from the Webster IOLTA of personal expenses for a total of $52,710.  Gx 1 (App. A-1,

---

[15] In 2011 there were 74 transfers from the IOLTA into the Webster Operating Account.  GX 1
(App. A-1-1 at 1-2).  In 2012, there were 42 transfers from the IOLTA into the Webster Operating
Account.  GX 1 (App. A-1-1 at 5-6).  In 2013, there were 35 transfers from the IOLTA, and 13
went into the Webster Operating Account, while 12 went into other accounts controlled by
Freeman such as another operating account at Webster, and a savings account and checking
account at Webster, both in Freeman's name.  GX 1 (App. A-1-1 at 7-8).

App. A-1-1 at 11-13).  These payments were for items such as paying the Ferrari, Lexus and Honda car payments, credit cards, condominium fees, and loan payments.  *Id.*

**Transfers to Webster IOLTA (credits):**  The Government identified six (6) banking transfers for a total of $17,700 from the Webster Operating Account to the Webster IOLTA.  The Government gave Freeman a credit for that amount (i.e., it was subtracted from Freeman's gross receipts total).  GX 1 (App. A-1, App. A-1-6).

The total payments to the defendant disbursed from the IOLTAs are as follows:

| Year | 2011 | 2012 | 2013 |
|---|---|---|---|
| **Total payments to Freeman from IOLTAs (less credits)** | $547,041 | $532,798 | $908,594 |

### 2.  Non-IOLTA Deposit Items ("Other Income")

The Government also included in Freeman's gross receipts other income Freeman received in the form of non-IOLTA deposit items.  As detailed on Appendix A-1 (GX 1), this income came in four different forms:  1) business deposits to the Webster Operating Account from third party payment processors (which allowed clients to make payments by credit card) and a marketing entity; 2) business deposits directly into the Webster Operating Account; 3) business deposits directly into the People's Personal Account; and 4) business deposits directly into the J.O. Nominee Account.  The Government relied on a hybrid analysis that is part "specific items" and part "bank deposits" method in order to classify some of these items because it was impractical to interview all of the individual check writers, especially here, where the amount of gross receipts/business income at issue is small relative to the IOLTA disbursement income, and where the circumstantial evidence that the items constitute gross receipts/business income is substantial.

For example, the deposits from Global Pay, a third party payment processor, into the defendant's Webster Operating Account as tracked by the Government are set forth on GX 1

(App. A-1 and App. A-1-3). The Government totaled each deposit made into the Webster Operating Account from Global Pay which totaled $20,037 in 2011, and $30,380 in 2012. GX 1 (App. A-1, A-1-3). In 2013, payments from Global Pay, and other payments from third parties, totaled $41,715.[16] GX 1 (App. A-1, A-1-3).

The defendant also made deposits of attorney's fees for non-personal injury cases directly into the Webster Operating Account. With one exception, those items either specifically referenced being for "Atty Fees," "Legal Fees," "Court Case" and/or were endorsed to Deron Freeman "Attorney" or the "Law Offices of Deron Freeman." GX 1 (App. A-1-3). Those items were deposited in 2013 and totaled $14,276. *See* GX 1 (App. A-1, A-1-3).

In 2011, 2012 and 2013, the defendant also made the following deposits of legal fees directly into his People's Personal Account: 13 checks totaling $6,325 in 2011, 9 checks totaling $16,821.20 in 2012, and 23 checks totaling $19,783.99 in 2013. These checks also bore notations indicating they were business deposits as, for example, "lawyer fees," "legal fees," "attorney fees," "legal services," "court," "pay lawyer," or "Atty Cost." *See* GX 1 (App. A-1-4).

In a highly unusual practice, the defendant started parking money belonging to him into the J.O. Nominee Account on or about December 9, 2011, just two months after entering into an installment agreement with the IRS. The defendant also used the J.O. Nominee Account to

---

[16] The IRP, a business record maintained by the IRS that tracks all Form 1099 payments to a taxpayer (explained in detail below), also establishes and further corroborates the Government's analysis. Third party payment processors such as Global Pay report payments to their payees (such as the defendant) by filing a Form 1099-K ("Payment Card and Third Party Network Transactions") with the IRS and providing a copy of that form to the payee. The IRP reports slightly higher payments from Global Pay for 2011 ($20,295) and 2012 ($30,850) than the Government uses in its analysis. *See* App. A-1, A-1-3. The IRP also reports slightly higher payments from Global Pay to the defendant in 2013, $22,701 rather than the $22,336 that the Government includes in its analysis. For 2013, the defendant received additional payments from Square, Inc., another third party payment processor, for $14,579, and $4,800 from a marketing entity, 6th Degree Marketing. *See* GX 1 (App. A-1, A-1-3).

receive some of his attorney's fees directly. In 2011, the defendant made four deposits of his business income into the J.O. Nominee Account totaling $8,568.20, and in 2012, he made three deposits totaling $8,325. GX 1 (App. A-1-5). With one exception (a check payable to Deron Freeman from a funeral home for $125), those deposits were in the form of checks, either from a referring law firm, or bore notations of "Attorney Deron Freeman," or "Attorney Fees."[17] *Id.*

Although the non-IOLTA deposit items ("Other Income" on Appendix A-1) is modest when compared to the IOLTA Disbursement income, it nonetheless totals $34,932 for 2011, $55,324 for 2012 and $75,730 for 2013. GX 1 (App. A-1).

### Calculation of Total Gross Receipts and Unreported Gross Receipts

The total actual gross receipts and unreported gross receipts are calculated by totaling payments to Freeman from IOLTAs, adding "other income," and subtracting the Schedule C gross receipts that Freeman declared on his tax returns. GX 1 (App. A-1).

| Year | 2011 | 2012 | 2013 |
|---|---|---|---|
| Total payments to Freeman from IOLTAs | $547,041 | $532,798 | $908,594 |
| Total "Other Income" | $34,932 | $55,526 | $75,730 |
| Total Gross Receipts (Actual) | $581,973 | $588,324 | $984,324 |
| Declared Schedule C Gross Receipts | $308,600 | $421,857 | $476,313 |
| **Unreported Gross Receipts** | **$273,373** | **$166,467** | **$508,011** |

### Calculation of Net Profit

The corrected net profit is calculated by taking the Total Gross Receipts (Actual) (from above), and subtracting all allowances and expenses the defendant declared on his returns. GX 1 (App. A-1).

---

[17] For example, a bank check payable to "Attorney Deron Freeman" for $8,000 which was deposited into the J.O. Nominee Account (by way of a deposit ticket with the "J.O." name handwritten after a crossout of a name starting with "D") with a reference name of J.C., was confirmed to relate to a criminal case that the defendant handled for J.C.'s brother. GX 9, 10.

| Year | 2011 | 2012 | 2013 |
|---|---|---|---|
| Total Gross Receipts (Actual) | $581,973 | $588,324 | $984,324 |
| Returns and Allowances per Returns | ($5,133) | ($31,440) | -- |
| Total Expenses per Returns | ($156,447) | ($240,140) | ($250,545) |
| Corrected Net Profit | $420,393 | $316,744 | $733,779 |
| Declared Net Profit | $147,020 | $150,277 | $225,768 |
| **Unreported Net Profit** | **$273,373** | **$166,467** | **$508,011** |

### Calculation of Taxable Income

The corrected taxable income is calculated by taking defendant's declared taxable income, adding in the Unreported Gross Receipts (from above), and correcting for certain statutory adjustments.[18]  GX 11 at 1.

| Year | 2011 | 2012 | 2013 |
|---|---|---|---|
| Declared Taxable Income | $76,759 | $64,911 | $163,013 |
| Unreported Gross Receipts | $273,373 | $166,467 | $508,011 |
| Statutory Adjustments | $308 | $132 | $14,825 |
| Corrected Taxable Income | $350,440 | $231,509 | $685,849 |
| **Unreported Taxable Income** | **$273,681** | **$166,598** | **$522,836** |

Whether one looks at unreported gross receipts, unreported net profit, or unreported taxable income, the amount of understatement is material by any measure.

**B.    IRP Specific Items Approach**

The second approach the Government used to determine unreported gross receipts/income is a "specific items" approach based on IRS records of Form 1099 money reported as having been paid to the defendant's law firm by third party insurance companies.  Personal injury settlement

---

[18] These statutory adjustments arise because certain allowances change depending on income level, so the increase in the defendant's gross receipts for each year caused changes in real estate loss (GX 12 at 10 (Schedule E); GX 11 at 1; GX 13 at 6 (Schedule E)), self-employment AGI adjustment (GX 11 at 272, 282, 293, 294); itemized deductions (GX 11 at 292); and exemptions (GX 11 at 289).

money paid by insurance companies to the defendant's law firm is reported on a Form 1099-MISC, a form used to record when an entity or person pays someone money (other than wages). As a regular part of its widespread recordkeeping function, the IRS maintains an Information Returns Processing (IRP) System which promptly receives and maintains data submitted by employers and other third party payers reporting monies paid on Forms 1099-MISC and Forms 1099-K (and other payments such as third party payment processors, wages, pensions, interest and dividends paid during the tax year). The Form 1099 information is validated and stored in the Information Return Master File (IRMF) and is retrievable on what is commonly referred to as an "IRP" form. The IRS maintains the IRP in the course of its regularly conducted activity.

The Form 1099-MISC itself has different boxes used by payers to report different types of income.[19] An insurance company reporting a settlement to a plaintiff's attorney such as the defendant fills in a specific box on the Form 1099-MISC entitled "Gross proceeds paid to an attorney" to report the money as attorney's fees,[20] files one copy to the IRS, and sends another copy to the payee. In this case, each of the Form 1099-MISC filed by insurance companies paying the defendant attorney's fees was filed electronically (as reflected on the IRP). GX 1B, 2B, 3B. Income that is listed in Box 14 of the Form 1099-MISC (Gross proceeds paid to an attorney) is noted on the IRP as "ATTRNY FEE."

In this case, the Government used IRS IRPs, a business record maintained in the course of regularly conducted activity by the IRS, to perform one of the "specific items" methods of

---

[19] For example, a Form 1099-MISC allows for the reporting of rents (Box 1), royalties (Box 2), other income (Box 3), fishing boat proceeds (Box 5), medical and health care payments (Box 6), nonemployee compensation (Box 7), and other types of income. *See* GX 15 (sample Form 1099-MISC for 2011).

[20] The appropriate box on the 2011, 2012 and 2013 versions of the Form-1099 MISC was Box 14 "Gross Proceeds Paid to an Attorney." *See, e.g.,* GX 15.

calculating unreported gross receipts.  Specifically, the Government reviewed each of the entries

on the IRP for 2011, 2012, and 2013 showing Form 1099-MISC attorney's fee income paid to the

defendant from insurance companies for 2011, 2012, and 2013.  GX 16-18.  For example, the

2011 IRP reports that Peerless Insurance Company paid $100,578 Form 1099-MISC "ATTRNY

FEE" income to the defendant's firm in 2011, and that Liberty Mutual Insurance Company paid

$34,427 Form 1099-MISC "ATTRNY FEE" income to the defendant's firm in 2011.  GX 16 at 2.

The Government confirmed that both of those checks (and indeed, all of the insurance company

checks paying attorney's fees listed on the IRPs for 2011, 2012, and 2013 were deposited into

defendant's IOLTAs).  The Government totaled all of the Form 1099-MISC "ATTRNY FEE"

income paid to the defendant's firm, and calculated the defendant's attorney's fee as one-third of

the total amount.  That one-third split was confirmed by the defendant, his former office manager,

his bookkeeper, and his return preparer as defendant's attorney's fee from insurance settlement

checks.  GX 19 at ¶ 20; GX 20A at ¶ 7; GX 20B at ¶ 11; GX 21 at ¶ 37.  Even though the one-

third amount understates defendant's gross receipts because it leaves out any fees earned from

non-personal injury work, it shows that the defendant's actual gross receipts (as well as his net

profit, and taxable income) materially exceeded the amounts he reported on his tax returns.  The

total amounts of "ATTRNY FEE" entries (GX 16 at 21; GX 17 at 23; GX 18 at 22) and the one-

third calculation as compared to the defendant's declared gross receipts are summarized below:

| Tax Year | "ATTRNY FEE" Reported by IRP | 1/3 of IRP "ATTRNY FEE" | Gross Receipts Reported by Freeman | Unreported Gross Receipts IRP Specific Items Method |
|---|---|---|---|---|
| 2011 | $1,651,211 | $550,404 | $308,600 | $241,804 |
| 2012 | $1,524,745 | $508,248 | $421,857 | $86,391 |
| 2013 | $2,467,668 | $822,556 | $476,313 | $346,243 |
| TOTAL: | $5,643,624 | $1,881,208 | $1,206,770 | $674,438 |

The IRP "specific items" approach, although less precise than the Disbursement and Deposit "specific items" method because it leaves out obvious sources of income, nonetheless shows that the defendant's declared gross receipts were materially understated.

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

*/s/ Susan L. Wines*
SUSAN L. WINES
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv2379
susan.wines@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700
Fax: (203) 773-5377

*/s/ Christopher W. Schmeisser*
CHRISTOPHER W. SCHMEISSER
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct14806
christopher.schmeisser@usdoj.gov

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on August 12, 2021, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Susan L. Wines*
Susan L. Wines
Assistant United States Attorney