UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:19CR220 (VAB) |
| | : | |
| v. | : | October 14, 2021 |
| | : | |
| DERON FREEMAN | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States submits this Trial Memorandum in advance of trial set to commence on October 20, 2021.

## I.    FACTUAL OVERVIEW

### A.    Background Facts

#### 1.    Defendant's Law Practice

The defendant in this case, attorney Deron D. Freeman, was admitted to the bar in the State of Connecticut in October 2000.  From approximately 2006 through 2017, the defendant was the head of his own law firm, The Law Offices of Deron D. Freeman, and counseled a steady stream of clients in the areas of personal injury law, criminal law, worker's compensation and real estate. The primary source of the defendant's income came from the settlement of personal injury lawsuits – more than 380 settlements successfully negotiated during 2011, 2012, and 2013, and the defendant was closely involved in every aspect of this work.

In order to initiate settlement negotiations with insurance adjusters, a member of the defendant's staff prepared a "demand package" – a collection of documents and information that the defendant used during his settlement negotiations – which was placed in defendant's office for his review.  It was the defendant, and the defendant alone, who would determine what total settlement to demand from the insurance company by filling in by hand a top-line settlement

demand number.  Defendant would return the package to a staff member for revision and after his changes were made, a copy was sent to the insurer and the package would be placed in the defendant's office, in a cubby where all demand packages were kept together, easily accessible to the defendant in case an insurance claim adjuster called to negotiate.

Once the defendant and an insurance company settled on a particular amount, someone at the defendant's office would prepare a settlement sheet detailing precisely how the settlement funds would be distributed, including the defendant's attorney fee, medical expenses, and the amount going to the client.  The settlement sheet would be placed in the defendant's office, again, typically on his chair for approval.  Once the defendant approved the settlement sheet and returned it, the defendant's staff would arrange for the client to sign it.  At that point, a release could be sent to the insurance company to clear the way for the check to be cut.

Once an insurance company received the release, the insurer would cut a check payable to the defendant and his client, and mail it to the defendant's office.  A member of the defendant's staff would notify him that the check had arrived so that the defendant could share the good news with his client.  A member of the defendant's staff would arrange for the client to come in to sign the check, and after giving the settlement check a couple of days to clear, would prepare checks in accordance with the settlement statement.  These checks, drawn on one of the defendant's IOLTA accounts, were again left for the defendant to sign.  Once the defendant signed the checks payable to the client and for case-related expenses, a member of his staff would call the client to pick up their check and mail the other checks out to the payees.  A member of the defendant's staff would also routinely prepare a deposit slip for the defendant's attorney fee check and clip that check along with the deposit slip for the defendant to use to deposit his own attorney fee checks.

Processing insurance settlement checks and the resulting attorney fee checks was a frequent occurrence at the defendant's law office. Indeed, in 2011, 2012 and 2013, the defendant received 382 settlement checks from various insurance companies that were deposited into his IOLTA accounts (one at Webster and one at People's Bank). GX 4A, 4B. The resulting attorney fee checks issued to the defendant from the Webster IOLTA and the People's IOLTA for those years totaled 446. GX 2A, 2B.

At the end of the year, insurance companies would issue a Form 1099-MISC to reflect the aggregate of all settlement amounts paid out to the defendant's law firm during the year. The insurer filed the Forms 1099-MISC with the IRS, and mailed a copy to the defendant at his law firm, where a staff member at the defendant's office would place the Forms 1099-MISC on his chair. Defendant received nearly 40 of these Forms 1099-MISC from insurance companies in each of 2011, 2012, and 2013, in amounts ranging from as low as $4,000 from Selective Insurance Company of South Carolina in 2012, to $303,166 from The Travelers in 2013.

In addition to personal injury cases, Freeman performed other legal work (e.g., criminal cases) for which he received fees in the form of checks directly from clients or payments from third party payment processors (e.g., Global Pay, which allowed clients to pay by credit card). The fees Freeman earned outside of personal injury cases represented less than 8% of the gross receipts calculated by the IRS on GX 2, although there was certainly additional cash and check deposits he took in during 2011, 2012, and 2013 which was not included as income in the IRS's analysis. The checks and other payments included in GX 2 were deposited directly into the J.O. Nominee Account, the People's Personal Account, or the Webster Operating Account.

### 2. Defendant's Bank Accounts

As an attorney licensed in the State of Connecticut, Freeman was required to register each

IOLTA into which the funds of more than one client were kept with the Statewide Grievance Committee.  On or about February 18, 2005, Freeman registered with the Statewide Grievance Committee an IOLTA he maintained in the name of his law firm at Webster Bank, account number ending in 5719 (the "Webster IOLTA"), with that account remaining an active registered account through the events at issue.  Freeman deposited gross receipts from insurance settlement checks into the Webster IOLTA in 2011, 2012, and 2013 in the aggregate amount of $3,580,649.20.

Unbeknownst to the Statewide Grievance Committee, Freeman maintained another IOLTA at People's United Bank, account number ending in 4379 (the "Undisclosed People's IOLTA").  Although that account was not used for years after it was opened, the defendant started using it extensively in 2012, depositing over $1,065,000 in 2012, and over $969,000 in 2013.  GX 10.  The defendant did not disclose the existence of that account to the Statewide Grievance Committee as he was required to do.

Freeman also maintained an operating account at Webster Bank, account number ending in 5726 (the "Webster Operating Account), a personal checking account at People's United Bank, account ending in 6605 (the "People's Personal Account"), and controlled money in an account in the name of a third party, J.O., at People's United Bank, account ending 6667 (the "J.O. Nominee Account").  The defendant started using the J.O. Nominee Account in late 2011, soon after he entered into a payment plan with the IRS, but failed to make payments -- a tactic that allowed him to safely park hundreds of thousands of dollars belonging to him without fear that the IRS would take it since it was deposited under the name of an unrelated third party.

The following table lists these five accounts and the years in which deposits of Freeman's gross receipts were made into them:

| Bank | Account Name | Account Type | Account # (last 4) | Deposit Years |
|---|---|---|---|---|
| Webster Bank | Attorney Deron D. Freeman ("Webster IOLTA") | IOLTA | 5719 | 2011 2012 2013 |
| People's United Bank | Attorney Deron D. Freeman ("Undisclosed People's IOLTA") | IOLTA | 4379 | 2012 2013 |
| Webster Bank | Law Offices of Deron D. Freeman ("Webster Operating Account") | Operating | 5726 | 2011 2012 2013 |
| People's United Bank | Deron D. Freeman ("People's Personal Account") | Personal checking | 6605 | 2011 2012 2013 |
| People's United Bank | J.O. ("J.O. Nominee Account") | Personal checking | 6667 | 2011 2012 |

As reflected in GX 6, the defendant maintained nearly 30 bank accounts during the relevant time period, but only the five accounts listed above are relevant for purposes of determining defendant's gross receipts, net profit or taxable income.

### 3.   Defendant's History with IRS Collections

As discussed below in the section regarding applicable law, the defendant's dealings with the IRS, whether prior or during the events at issue, are particularly important evidence of the defendant's knowledge of his tax reporting duties, his payment obligations and his basic attitude toward tax compliance.  In the present case, the Government will present evidence of such history with the IRS, which demonstrates an unfortunate pattern of failing to file timely returns; failing to pay taxes when due for years thereafter; and otherwise waiting until the IRS begins to file liens and seize assets before taking steps to follow the law – or, as the evidence will show, to hide his assets in a nominee account and to understate his gross receipts and income.

Reflecting this tax history, the Government will introduce detailed IRS Account Transcripts for each tax year from 2006 through 2016.  GX 20 – 23, 25, 26A, 27A, 28A, 29, 30, 31.  These transcripts provide tax history for any given tax year, including identifying subsequent failures to file a tax return when due, steps taken by the IRS to notify the defendant of that failure,

efforts to collect monies, penalties and interest due, efforts to lien and seize assets, if necessary, and steps regarding the implementation of installment agreements to pay monies owed. Also captured on the transcripts are the limited, often compelled, payments ultimately made toward a given year. While each individual transcript tells an important story of the defendant's relationship with the IRS, the patterns are even more striking when the defendant's tax history is reviewed in chronological order so that his failures regarding his 2007, 2008, 2009 tax filings and each year thereafter can be seen in real time, as notices pile up and payments dwindle.

The Government will introduce GX 1 which outlines this aggregate timeline of IRS activity with the defendant. GX 1. As is clear from that exhibit, the defendant was faced with repeated notices and an early lien placed on assets, and later put into an installment agreement for 2008 and 2009 taxes on September 30, 2011, on which he apparently failed to make initial payments. GX 1, 22, 23. On December 9, 2011, the defendant started to stash money in the J.O. Nominee Account, ultimately depositing over $360,000 into the account in less than six months. GX 1. By June 1, 2012, sufficient payments had been made so that the IRS removed the lien for the 2008 tax year. GX 1. Free of the IRS's immediate scrutiny, the defendant pulled more than $248,000 out of the J.O. Nominee Account in one fell swoop, and deposited the money into his personal money market account to kick off what turned out to be a nearly four-year spending spree. From June 2012 through March 2016, defendant ignored his tax obligations, filed false tax returns for 2011, 2012 and 2103 that markedly understated gross receipts and income, and paid only nominal taxes, failing to pay significant taxes owed on the 2012 through 2015 tax returns despite having money to pay. It was only in June 2016, when the IRS again started enforced collection action against the defendant, that he again asked for an installment agreement (a last resort for taxpayers who lack the ability to pay what they owe at one time). The defendant has yet

to pay taxes owed on the approximately $950,000 in unreported income for the false tax returns filed in 2011, 2012, and 2013.

### 4. Defendant's Experience with the Statewide Grievance Committee

As outlined in the Government's response to the defendant's Motion in Limine, the Government will introduce limited evidence relating to the defendant's dealings with the Statewide Grievance Committee. As an initial matter, the Government will have a representative explain the registration requirements for IOLTA accounts, and the fact that Freeman never registered the Undisclosed People's IOLTA into which he deposited nearly $2,000,000 in two years. GX 165, GX 166.

The witness will also provide guideposts regarding a grievance matter instituted against the defendant. The relevance of the grievance filing and the immediate steps taken thereafter is not the grievance itself, but the impact the filing had on the defendant's detailed knowledge of his financial affairs, as the defendant has admitted under oath. (The timing of the matter also provides some circumstantial justification why the defendant stopped use of his Undisclosed People's IOLTA at about the same time. In light of scrutiny the Grievance Committee was giving his use of a *disclosed* Webster IOLTA, it is understandable that the defendant might fear the impact on his license of the discovery of an entirely different unregistered IOLTA.) Notice of the grievance was provided the defendant on or about April 1, 2013. GX 163. The grievance panel found probable cause of a violation on May 21, 2013, a fact that would make clear to the defendant that the panel's scrutiny would not abate. The matter was transferred to the Superior Court, GX 172, and an order entered that required the defendant's Webster IOLTA account to be audited for the first half of 2014. GX 167. The defendant was provided with details of the upcoming audit by letter. GX 168. These are the basic outline of events that resulted in the defendant undertaking an

extensive review of his bank records, beginning in late 2013, as he has admitted in testimony in

court, GX 170A and 171A, detailed knowledge that makes any suggestion incredible that he

somehow forgot hundreds of thousands of dollars of gross receipts on tax returns for 2012 and

2013 that he filed in 2014.

### 5. Defendant's Lifestyle and Spending

Throughout defendant's back and forth with IRS Collections, the defendant spent lavishly

on luxury items.  He drove a series of high-end cars, including a Ferrari (after trading in his

Bentley), and a Cadillac Escalade; he captained several watercraft, including a 34-foot Crownline

cruiser, a 4-passenger Bombardier jet ski, and a 4-passenger Sea Doo 150 jet ski.  During this

same timeframe, while being chased by Collections and failing to pay what he owed, defendant

undertook construction of a new, custom-designed home boasting over 7,100 square feet of living

area, a $250,000 geothermal system, a top-of-the-line audio and security system, $100,000 in

marble tile (for material costs alone), and an indoor pool.  Between 2012 and 2016, defendant

spent approximately $1.5 million in constructing this home, **not** counting an additional $1,000,000

he borrowed from his brother to finance the initial construction costs.

## II.   APPLICABLE LAW

### A.   False Tax Returns

The Superseding Indictment includes three felony counts of filing false tax returns for

2011, 2012 and 2013 in violation of 26 U.S.C. § 7206(1).  In order to prove a violation of Section

7206(1), the Government must show:  (1) the defendant made and subscribed a return, statement,

or other document which was false as to a material matter; (2) the return, statement, or other

document contained a written declaration that it was made under the penalties of perjury; (3) the

defendant did not believe the return, statement, or other document to be true and correct as to

every material matter; and (4) the defendant falsely subscribed to the return, statement, or other document willfully, with the specific intent to violate the law. *United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000).

The Second Circuit has stated that a false statement on a tax return is material if it has the potential for influencing or impeding the IRS in verifying the return or if it was essential to an accurate computation of taxes owed. *See United States v. Greenberg*, 735 F.2d 29, 32 (2d Cir. 1984) (fraudulent allocation of income to Greenberg's wife on joint personal returns combined with underreporting of Greenberg's own income, was material because it "had the potential for hindering the IRS's efforts to monitor and verify the tax liability of . . . the Greenbergs"); *United States v. Mittelstaedt*, 31 F.3d 1208, 1221 (2d Cir. 1994) (noting that defendant's failure to disclose another partner's interest in a partnership tax return was material because it "had the potential for hindering the IRS's efforts to monitor and verify [the other partner's] tax liability."); *United States v. Klausner*, 80 F.3d 55, 60 (2d Cir. 1996) (finding tax preparer's inclusion of false itemized deductions on clients' returns to be material because these inaccuracies would disrupt the IRS's efforts to ascertain clients' tax liabilities); *Pirro*, 212 F.3d at 89 ("[a] false statement is "material" when it has "the potential for hindering the IRS's efforts to monitor and verify the tax liability of the corporation and the taxpayer.").

A false statement regarding gross receipts need not be "substantial" in order to be material because an accurate statement of gross receipts is essential to an accurate computation of taxes owed. In *United States v. Greenberg*, the Second Circuit upheld the defendant's conviction under §7206(1) based on his overstating his wife's income while understating his own, even though this produced a tax deficiency of only $48. 735 F.2d at 31. The court reasoned:

> The purpose of § 7206(1) is not simply to ensure that the taxpayer pay the proper amount of taxes – though that is surely one of its goals.

> Rather, that section is intended to ensure also that the taxpayer not make misstatements that could hinder the [IRS] in carrying out such functions as the verification of the accuracy of that return or a related tax return.

*Id. See also United States v. Citron*, 783 F.2d 307, 313–14 (2d Cir.1986) (finding that critical element § 7206(a) is a "material" misstatement, not evasion of a substantial tax, and noting that any "false statements relating to gross income, irrespective of the amount, constitute a material misstatement in violation of Sec. 7206(1).") (*quoting United States v. Hedman*, 630 F.2d 1184, 1196 (7th Cir.1980). *Accord United States v. Holland,* 880 F.2d 1091, 1096 (9th Cir.1989) (stating that "any failure to report income is material"); *United States v. Young,* 804 F.2d 116, 119 (8th Cir.1986) (concluding that the omission of information necessary to compute income is material); *United States v. Holladay*, 566 F.2d 1018, 1020 (5th Cir. 1978) (*per curiam*) (finding that defendant's failure to report substantial gross receipts from gambling and bootlegging operation conducted at his service station sufficient to support conviction even though government did not prove defendant received any profits or income from the illicit business); *United States v. Herman*, 97 F.3d 251, 270 (failure to report gross receipts was a material misrepresentation supporting conviction for filing false returns); *United States v. Taylor*, 574 F.2d 232, 236 (5th Cir, 1978) (proof of unreported gross receipts sufficient to sustain conviction in a false return case, rejecting contention that government need prove up gross income or tax liability).

To prove willfulness the Government must prove a voluntary, intentional violation of a known legal duty. *Cheek v. United States*, 498 U.S. 192, 200 (1991). Willfulness is determined by a subjective standard; thus defendants are not required to have been objectively reasonable in their misunderstanding of their legal duties or belief that they were in compliance with the law. *Cheek*, 498 U.S. at 203. But whatever the defendant's professed state of knowledge, the jury may "consider the reasonableness of the defendant's asserted beliefs in determining whether the belief

was honestly or genuinely held." *United States v. Grunewald*, 987 F.2d 531, 536 (8th Cir. 1993); *United States v. Little*, 828 Fed. Appx. 34, 39 (2d Cir. 2020) (upholding jury instruction to "consider whether the defendant's belief was actually reasonable as a factor in deciding whether he held the belief in good faith" that he was not required to file a tax return).

Absent an admission or confession, which is seldom available, or accomplice testimony, willfulness is rarely subject to direct proof and must generally be inferred from circumstantial evidence based on the defendant's acts or conduct. *See United States v. Dyer,* 922 F.2d 105, 108 (2d Cir.1990) ("[A]n inference of willfulness based on circumstantial evidence is permissible. . . ."); *United States v. Schiff,* 801 F.2d 108, 111 (2d Cir.1986) ("willfulness of one accused of tax crimes may be proved by circumstantial evidence"); *United States v. MacKenzie,* 777 F.2d 811, 818 (2d Cir.1985) ("knowledge of the law was inferable and proven from" particular acts of the defendants); *Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) (willfulness may be inferred from circumstantial evidence).

A number of factors are relevant to willfulness, including:

- The defendant's background and education. Where a defendant is highly educated, particularly in the case of a lawyer, such background and education may support an inference that the defendant had knowledge of the law. *See, e.g., United States v. Bok*, 156 F.3d 157, 166 (2d Cir. 1998) (finding defendant's failure to file returns until told to do so by IRS indicative of intent to evade, particularly "in light of [defendant's] legal education, which included coursework in both corporate and personal taxation."); *MacKenzie*, 777 F.2d at 818 (finding knowledge element in criminal failure to withhold taxes based on defendants' backgrounds (each with a college degree, one in economics and another in

business) which demonstrate "the likelihood they knew what the law required.").

- Whether the defendant had a past history of tax non-compliance. *See, e.g., Klausner,* 80 F.3d at 63 ("[a]s we have often explained, a defendant's past taxpaying record is admissible to prove willfulness circumstantially; holding that failure to file income tax returns and underestimating tax liability for purposes of estimated payments for the tax years at issue constituted evidence of willfulness); *United States v. Ebner,* 782 F.2d 1120, 1126 n. 7 (2d Cir.1986) ("The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years."); *United States v. Magnus,* 365 F.2d 1007, 1011 (2d Cir.1966) ("[P]rior taxpaying history, both federal and state, was probative of [taxpayer's] willfulness in failing to pay substantial amounts of federal taxes in [the years at issue.]").

- Whether the defendant displayed a consistent pattern of underreporting large amounts of income. *See United States v. Koskerides*, 877 F.2d 1129, 1138 (2d Cir. 1989) (finding defendant's pattern of evasion over a three year period, the magnitude of the evasion, and defendant's understanding and involvement in filing of his income tax returns sufficient to infer willfulness); *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989) (consistent underreporting of income demonstrated an intentional violation of defendants' duty to pay taxes).

- Spending in excess of reported cash available according to filed tax return. *See United States v. Olbres*, 61 F.3d 967, 971-72 (1st Cir. 1995) ("To be sure, the evidence pertaining to the defendants' lavish spending is circumstantial and suggestive, not direct and irrefutable. Yet, the arithmetic furnishes a sturdy

infrastructure capable of supporting a reasonable inference that the defendants must have been aware that their 1987 return substantially underreported their income); *Kim*, 884 F.2d at 192 (finding extensive real estate purchases well out of line with reported income supported finding of willfulness); *United States v. Daniels,* 617 F.2d 146, 150 (5th Cir.1980) (spending of large amounts of cash that cannot be reconciled with the amount of reported income supported willfulness).

- Proof that knowledgeable persons warned the defendant of tax improprieties. *United States v. Collorafi*, 876 F.2d 303, 304-05 (2d Cir. 1989) (finding trial court erred in excluding two prior court orders which concluded that defendants' argument that wages were not income and thus not subject to withholding were frivolous); *Ebner,* 782 F.2d at 1125–26 (defendants could not claim good faith belief in tax exempt status where prior court ruling found their claims invalid).

In addition, the defendant cannot claim lack of knowledge of relevant facts if he consciously avoided learning those facts. If the defendant deliberately avoided acquiring knowledge of a fact or the law, then the factfinder may infer that he actually knew it and that he was merely trying to avoid giving the appearance (and incurring the consequences) of knowledge. *See United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986). *"*[I]n federal courts, willful blindness instructions – sometimes called "deliberate ignorance" or "conscious avoidance" or "ostrich" instructions – are now commonly given and commonly upheld. All of the other circuits with criminal jurisdiction have approved such instructions for a wide range of criminal offenses . . .." *United State v. Alston-Graves*, 435 F.3d 331, 338 (D.C. Cir. 2006) (citing cases). *See also United States v. Rodriguez*, 983 F.2d 455, 457-58 (2d Cir. 1993) (noting that in the Second Circuit, unlike the Ninth, a "conscious avoidance" charge is "commonly used.").

Thus, in a criminal tax prosecution, when the evidence supports an inference that a defendant was subjectively aware of a high probability of the existence of a tax liability, and purposefully avoided learning the facts pointing to such liability, the trier of fact may find that the defendant exhibited "willful blindness" satisfying the scienter requirement of knowledge. *United States v. Poole,* 640 F.3d 114, 122 (2d Cir. 2011). *See also United States v. MacKenzie*, 777 F.2d 811, 818 n.2 (2d Cir. 1986) (in conspiracy and false returns case applying conscious avoidance instruction and noting "The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him."). Nor may a defendant consciously avoid knowing what the tax laws require, namely, that one must file accurate returns and pay estimated and other taxes due by April 15 each year. *See United States v. Schiff*, 801 F.2d 108, 113 (2d Cir. 1986) ("the conscious avoidance instruction permits a jury, on the basis of all of the evidence, to decide that the point at which the defendant is on notice of the law, whether he subjectively agrees with it or not, has been reached.").

In *United States v. Ebner,* 782 F.2d 1120, 1125 (2d Cir.1986), the Second Circuit rejected defendants' claim of good faith belief in the tax exempt status of their church because a prior court ruling found their tax exempt claims invalid. The Second Circuit concluded that defendants *could not reasonably believe* their church was tax exempt where a prior court ruling determined those to be claims invalid, and emphasized:

> This is necessary because otherwise, "any taxpayer could evade tax obligations simply by stubbornly refusing to admit error despite the receipt of any number of authoritative statements of the law. At some point, such stubbornness becomes unreasonable; the line is crossed between misunderstanding and disagreement and the taxpayer can no longer successfully assert a defense of good faith.

*Id.* at 112.

The rationale supporting the principle of willful blindness is that intentional ignorance and actual knowledge are equally culpable under the law. *Pool*e, 640 F.3d at 122; *Stadtmauer*, at 255; Jewell, 532 F.2d at 700. As described by the Second Circuit, "a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil.'" *United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994).

Here, the Government will prove that defendant failed to report over $950,000 in gross receipts for tax years 2011, 2012, and 2013, and thus, that the defendant's returns were materially false. GX 2. The Government will also prove that the defendant caused and procured these false returns by failing to provide accurate or complete information concerning his gross receipts to his return preparer for 2011 and 2012 and by omitting several hundred thousand dollars of gross receipts from his 2013 return.

As for willfulness, the evidence at trial will show that the defendant either actually knew or actively avoided knowing the extent of his gross receipts. Evidence of the defendant's substantial gross receipts was everywhere he turned – in the demand packages left for him to approve setting forth gross settlement amounts; in the settlements he negotiated with insurance adjusters; in the settlement statements he signed; in the settlements checks mailed to his law firm; in the hundreds of attorney fee checks written to him from the IOLTAs; in the regular trips he made to the bank to deposit his attorney fee checks; in the Form 1099s mailed to his office by insurance companies at the end of the year; in the auditing he undertook of his accounts in 2013 and 2014; in the representations of income he made on car lease applications; and in the extravagant lifestyle all of these settlements funded. That defendant willfully violated the tax laws is also apparent because he substantially underreported income for three straight years, even while under an installment agreement with the IRS. Rather than take heed of what any experienced, licensed attorney, let

alone an attorney who took a tax course while in law school would know, namely, that you need to file accurate returns and pay your taxes on time, defendant dodged.  While under a payment plan with the IRS, he took to stashing hundreds of thousands of dollars of his money in an account belonging to a friend, and used the money to buy real property.

At best, defendant stuck his head in the sand in order to avoid confirming what anyone familiar with his spending habits would have known – that is, that defendant had a lot more to spend than he declared.  Defendant reported before tax taxable income of $76,759 in 2011, $64,911 in 2012, and $163,013 in 2013.  Assuming that the tax the defendant reported as owing would not have been available to spend, defendant's available spending money from his declared income would have been even less -- $61,395 in 2011, $46,877 in 2012, and $103,855 in 2013.  Given his extravagant lifestyle, those numbers just don't work, and 7,100 square feet of marble floors in the defendant's custom-designed home certainly told him that.

### B.    Willful Failure to Pay

The Superseding Indictment also charges four misdemeanor counts of willful failure to pay taxes for the 2012, 2013, 2014, and 2015 tax years in violation of 26 U.S.C. section 7203.  The elements of a willful failure to pay are:  (1) the defendant had a duty to pay a tax; (2) the tax was not paid at the time required by law; and (3) the failure to pay was willful.  *United States v. Tucker*, 686 F.2d 230, 232 (5th Cir. 1982).

The Government does not need to show that the defendant committed any affirmative act in furtherance of the crime.  Instead, all that is required is that the defendant knew he owed tax for the tax year at issue and failed to make such payments as required.  *See, e.g., Sansone v. United States*, 1380 U.S. 343, 351 (1965) (the § 7203 misdemeanor requires only "willfulness and the omission of the required act—here the payment of the fact when due.").

Along with all of the other factors showing willfulness described above, a defendant's prior taxpaying history is relevant in a willful failure to pay case as it bears on the taxpayer's attitude toward the reporting and payment of taxes generally. *See United States v. Magnus*, 365 F.2d 1007, 1011 (2d Cir. 1966) (prior taxpaying history, both federal and state, can be probative of a taxpayer's willfulness in failing to pay substantial amounts of federal taxes in the years at issue).

As is plainly evident from even the basic instructions accompanying the Forms 1040, the law imposed a duty on the defendant to pay his income taxes each year by no later than April 15, and defendant failed to pay them in full or on time. GX 26C ("[a]n automatic 6-month extension to file does not extend the time to pay your tax. If you do not pay your tax by the original due date of your return, you will owe interest on the unpaid tax and may owe penalties.") Indeed, the defendant failed to pay even taxes he reported as owing based on materially understated income for the 2011, 2012, and 2013 tax years. Instead, as will be developed further at trial, from the period 2010 until 2016, the defendant engaged in a spendthrift lifestyle, using his own considerable income, as well as money loaned to him by his brother, to purchase land and construct an expensive custom home for himself, to buy or lease multiple expensive cars and boats, and to live extravagantly. The evidence will establish that the defendant engaged in a continuing pattern of illegally deferring and denying his legitimate tax obligations, despite the plain resources to meet them. In fact, the defendant routinely deferred payment until the IRS literally had to seize his assets, despite having the resources to spend lavishly elsewhere.

As evidence of this pattern, when the IRS approached the defendant in 2010 to secure taxes he owed but had yet to pay, the defendant began parking hundreds of thousands of dollars of his income in a friend's bank account. The defendant then turned to stashing attorney's fees he had earned in an IOLTA account that he did not disclose to the State Grievance Committee as he was

required to do.  This consistent pattern of tax avoidance, even in the face of persistent collections efforts by the IRS, continued with his subsequent failures to file timely tax returns, failures to timely pay his taxes for the 2012 through 2015 tax years, and the late filing of tax returns for 2011 through 2013 that markedly understated his gross receipts, his net profit and his taxable income, and ultimately taxes owed.  Although willfulness does not require the government to prove that the taxpayer had the financial ability to pay his or her taxes when they came due, that the defendant in this case plainly had the ability to pay but chose not to, is certainly evidence that his failure to pay was willful.  *United States v. Easterday*, 564 F.3d 1004, 1010 (9th Cir. 2008).

## III.     EVIDENTIARY AND OTHER TRIAL CONSIDERATIONS

### A.     Calculation of Gross Receipts

As described in the Government's Response to Defendant's Pretrial Motion for a Bill of Particulars [Doc. #46] ("Government's Particularity Response"), the Government used two different methods to prove defendant's actual gross receipts, net profit and taxable income for the given tax year.  The first method is a specific items" approach in which the government proves each specific item it seeks to classify as gross receipts using various forms of evidence including the defendant's admissions, bank records, testimony of inside witnesses (e.g., the defendant's employees), and documentation of witnesses engaged in the transactions.  The "specific items" approach in this case relies on individual entries on the IRS "IRP" records showing income from settlements with various insurance companies reported to the IRS each year on Forms 1099-MISC.

The second approach is a hybrid approaching using specific items and the "bank deposit" method, an indirect method of proof which looks at deposits to defendant's bank accounts in the context of an ongoing business and allows reasonable inferences from background information

such as the character and size of deposits, the apparent sources of the deposits, the manner of the deposits, to determine whether such deposits constitute income. *See, e.g., United States v. Slutsky*, 487 F.2d 832, 841-42 (2d Cir. 1973).

The latter analysis results in greater exactness of the final figures, but requires more evidentiary proof. Ultimately, in evaluating the materiality of the alleged falsehood of gross receipts, net profit or taxable income, the Court may determine that enough is enough, and that it need not reach the more detailed hybrid method of proof to conclude that the return for a given tax year contains one or more instances of materially false information. *See United States v. Nunan*, 236 F.2d 576, 585 (2d Cir. 1956) (finding sufficient evidence on specific items theory without needing to reach bank deposits analysis).

The Government's Particularity Response described in detail how these analyses were performed, and will not repeat that detail here. However, because the Government intends to introduce multiple summary charts at trial as substantive evidence, it is worthwhile to tie some of the explanation to summary chart exhibits.

GX 2 (below) provides a summary of the hybrid specific items/bank deposits approach used to determine defendant's actual gross receipts, unreported, gross receipts and corrected net profit.[1]

---

[1] A draft of GX 2 was provided to the defense as early as January 24, 2019. *See* Doc. #46 n.2.

| Computation of Unreported Income | | | | |
|---|---|---|---|---|
| | 2011 | 2012 | 2013 | GX |
| **Payments from IOLTA Accounts:** | | | | |
| Checks payable to Deron Freeman from Webster IOLTA | $ 375,554.43 | $ 106,441.88 | $ 484,109.40 | 2A |
| Checks payable to Deron Freeman from Undisclosed People's IOLTA | | $ 359,429.60 | $ 325,498.11 | 2B |
| Transfers from IOLTAs | $ 176,421.74 | $ 66,926.17 | $ 61,577.29 | 2A |
| Expenses paid from Webster IOLTA | | | $ 52,709.56 | 2A |
| Less: Transfers from Webster Operating Account to Webster IOLTA | $ (2,400.00) | | $ (15,300.00) | 2F |
| **Total Payments to DERON FREEMAN from IOLTAs** | **$ 549,576.17** | **$ 532,797.65** | **$ 908,594.36** | |
| | | | | |
| **Other Income:** | | | | |
| Global Pay / Square, Inc. Deposits to Webster Operating Account | $ 20,036.75 | $ 30,379.91 | $ 36,914.62 | 2C |
| 6th Degree Marketing (1099-Misc issued) - Webster Operating Account | | | $ 4,800.00 | 2C |
| Business Deposits to Webster Operating Account | | | $ 14,276.25 | 2C |
| Business Deposits to People's Personal Checking Account | $ 6,326.89 | $ 16,821.20 | $ 19,738.99 | 2D |
| Business Deposits to J.O. Nominee Account | $ 8,568.20 | $ 8,325.00 | | 2E |
| **Total Other Income:** | **$ 34,931.84** | **$ 55,526.11** | **$ 75,729.86** | |
| | | | | |
| **Total Gross (Business) Receipts** | **$ 584,508.01** | **$ 588,323.76** | **$ 984,324.22** | |
| | | | | |
| Less: | | | | |
| Schedule C Gross Receipts Reported on Form 1040 | $ 308,600.00 | $ 421,857.00 | $ 476,313.00 | 26, 27, 28 |
| Equals: | | | | |
| **Unreported Gross Receipts** | **$ 275,908.01** | **$ 166,466.76** | **$ 508,011.22** | |
| | | | | |
| Less: | | | | |
| Returns and Allowances Per Return | $ 5,133.00 | $ 31,440.00 | $ - | 26, 27 |
| Total Expenses Per Return | $ 156,447.00 | $ 240,140.00 | $ 250,545.00 | 26, 27, 28 |
| | | | | |
| **Corrected Net Profit:** | **$ 422,928.01** | **$ 316,743.76** | **$ 733,779.22** | |

The top part of the chart entitled "**Payments from IOLTA Accounts**" details

**disbursements** from defendant's IOLTA accounts that constitute income to the defendant.  These

disbursements came in one of three ways:

- checks drawn on one of the IOLTAs payable to the defendant;

- transfers from the IOLTAs to the Webster Operating Account; or

- expenses paid directly from the IOLTAs (such as educational loan payments, credit

  card payments, and car payments).

Evidence at trial will establish that these disbursements are clear income to the defendant,

a fact that he admitted during an interview with the IRS.  GX 152 at ¶¶ 20, 22, 40.  The

disbursement and deposit items (whether checks, transfers, or expense payments) are individually

described and summarized in GX 2A, 2B and 2F, and copies of these individual items are set forth in GX 2A-1 to 2A-3, 2B-1, 2B-2, 2C-1, 2D-1 to 2D-3, 2E-1, 2E-2, 2F-1 and 2F-2.

Under the portion of GX 2 entitled "**Other Income**" additional **deposits** that constitute income to the defendant are totaled. These deposits went into three bank accounts associated with the defendant:

- deposits to defendant's Webster Operating Account by third parties (Global Pay and Square, Inc.) which testimony at trial will establish are credit card processing companies (GX 2C);

- business deposits to defendant's Webster Operating Account (GX 2C);

- business deposits to People's Personal Checking Account (GX 2D), and

- business deposits to the J.O. Nominee Account (GX 2E).

Trial testimony will establish that the nature, timing and amounts of these deposits, along with notations such as "atty fees" establish these items as income to the defendant. The deposit items are individually described and summarized in GX 2C, 2D, and 2E, and copies of the individual bank deposit items are provided in GX 2C-1, 2D-1 to 2D-3, 2E-1, 2E-2.

The upshot of GX 2 and all of its supporting schedules is that the defendant materially underreported his gross receipts in 2011, 2012 and 2013 as follows:

### CALCULATION OF UNREPORTED GROSS RECEIPTS

|  | 2011 | 2012 | 2013 |
|---|---|---|---|
| Gross Receipts (Calculated by IRS) | $584,508 | $588,324 | $984,324 |
|  |  |  |  |
| Gross Receipts (Declared by Freeman on Form 1040) | $308,600 | $421,857 | $426,313 |
|  |  |  |  |
| Unreported Gross Receipts | $275,908 | $166,467 | $508,011 |

The IRS validated its calculation of gross receipts in two ways, as summarized on GX 4 (below).  The top box totaled only disbursements to the defendant from the IOLTAs for 2011, 2012, and 2013 (excluding the "other income" from GX 2).

**VALIDATION OF IOLTA PAYMENTS TO FREEMAN (GX 2)**

| Total Payments to Freeman from IOLTAs | 2011 | 2012 | 2013 |
|---|---|---|---|
|  | $549,576 | $532,798 | $908,594 |

Then, instead of looking at payments **out of** the IOLTA accounts to the defendant, the IRS totaled insurance company settlement checks **into** the IOLTA accounts.  Taking one-third of those total deposits (to account for the defendant's share of the settlement) would approximate the defendant's gross receipts.  Those amounts are $508,742 for 2011, $525,459 for 2012, and $837,557 for 2013 -- figures that are within the range of the total payments and well above what the defendant reported.

| Calculation Based on Insurance Co. Check Deposits to IOLTAs | 2011 | 2012 | 2013 |
|---|---|---|---|
| Webster IOLTA | $1,526,225 | $511,250 | $1,543,174 |
| Undisclosed People's IOLTA | -- | $1,065,128 | $969,497 |
| Total | $1,526,225 | $1,576,378 | $2,512,671 |
| 1/3 Calculation | $508,742 | $525,459 | $837,557 |

Finally, the IRS looked at the amount of settlements reported to the IRS by insurance companies as summarized by an IRS document called the "IRP" (Information Return Processing) and again, took one-third to represent defendant's gross receipts.  Those amounts too, approximate the total payments to the defendant from the IOLTAs and validate the IRS methodology.

| Calculation Based on 1099 Payments Reported to IRS Reflected on IRP | 2011 | 2012 | 2013 |
|---|---|---|---|
| Total | $1,651,211 | $1,524,745 | $2,467,668 |
| 1/3 Calculation | $550,404 | $508,248 | $822,556 |

**B.**     <u>**Stipulation Concerning Admissibility of Documents**</u>

In order to greatly reduce the number of witnesses who are called to testify at trial and streamline the presentation of evidence generally, the parties anticipate entering into a broad stipulation providing that:

1.     Documents bearing Bates numbers for a range of exhibits (including, for example, bank records, IRS records, DMV records and various documents produced by subcontractors) are authentic pursuant to Fed. R. Evid. 901(a) or 902.

2.     Such documents listed above are business records of the stated entity (Fed. R. Evid. 803(6)); public records (Fed. R. Evid. 803(8); and/or admissions of a party opponent. Fed. R. 801(d)(2), subject to objection at trial.

3.     Summary Charts on the Government's Exhibit List (GX 1-10) are admissible subject to objections specified in the Stipulation.

**C.**     <u>**Use of Summary Charts**</u>

Pursuant to the parties' stipulation and Fed. R. Evid. 1006, the Government intends to introduce summary charts GX 1 – GX 10 as substantive evidence.  Pursuant to Fed. R. Evid. 1006, "[t]he contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  The Second Circuit has "regularly affirmed the use of such charts."  *United States v. Yousef,* 327 F.3d 56, 158 (2d Cir.2003) (upholding use of telephone summary charts).  *See also* 6 Weinstein's Federal Evidence

§ 1006 .04[2] (2d ed.2008) (distinguishing between summaries admitted pursuant to Fed. R. Evid.

§ 1006 and pedagogical-device summaries which are not admitted as evidence).

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

*/s/ Susan L. Wines*
SUSAN L. WINES
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv2379
susan.wines@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700
Fax: (203) 773-5377

*/s/ Christopher W. Schmeisser*
CHRISTOPHER W. SCHMEISSER
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct14806
christopher.schmeisser@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700
Fax: (203) 773-5377

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on October 14, 2021, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/  Susan L. Wines*
Susan L. Wines
Assistant United States Attorney