# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES, <br><br> v. <br><br> DERON FREEMAN, <br> *Defendant.* | No. 3:19-cr-00220 (VAB) |

## VERDICT AND SPECIAL FINDINGS

Deron D. Freeman ("Defendant") has been charged with (1) making and subscribing a false tax return in the 2011 tax year in violation of 26 U.S.C. § 7206(1) ("Count One"); (2) making and subscribing a false tax return in the 2012 tax year in violation of 26 U.S.C. § 7206(1) ("Count Two"); (3) failure to pay income tax in the 2012 tax year in violation of 26 U.S.C. § 7203 ("Count Three"); (4) making and subscribing a false tax return in the 2013 tax year in violation of 26 U.S.C. § 7206(1) ("Count Four"); (5) failure to pay income tax in the 2013 tax year in violation of 26 U.S.C. § 7203 ("Count Five"); (6) failure to pay income tax in the 2014 tax year in violation of 26 U.S.C. § 7203 ("Count Six"); and (7) failure to pay income tax in the 2015 tax year in violation of 26 U.S.C. § 7203 ("Count Seven"). *See* Superseding Indictment, ECF No. 37 (May 10, 2021) ("Superseding Indictment").

Following a six-day bench trial, the Court now sets forth its findings of fact and verdict under Federal Rule of Criminal Procedure 23(c).[1] Fed. R. Crim. P. 23(c).

---

[1] Federal Rule of Criminal Procedure 23(c) provides:

> In a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion.

Fed. R. Crim. P. 23(c).

For the reasons explained below, the Court finds Mr. Freeman **GUILTY** as to all counts.

## I. PROCEDURAL HISTORY

On September 5, 2019, a grand jury indicted Mr. Freeman on two counts of making and filing a false tax return in violation of 26 U.S.C. § 7206(1). *See* Indictment, ECF No. 1 (Sept. 5, 2019). Following his subsequent arrest, *see* Arrest Warrant, ECF No. 3 (Sept. 5, 2019), Mr. Freeman pled not guilty to the charges in the Indictment, *see* Min. Entry, ECF No. 7 (Sept. 10, 2019).

On September 10, 2019, U.S. Magistrate Judge William I. Garfinkel released Mr. Freeman on bond, imposing conditions on his release pending trial. *See* ECF No. 8 (Sept. 10, 2019); Order, ECF No. 9 (Sept. 10, 2019).

On May 10, 2021, following several requests for extensions of time, the Government filed a Superseding Indictment charging Mr. Freeman with three counts of making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1) for the 2011, 2012, and 2013 tax years, and four counts of failure to pay income tax in violation of 26 U.S.C. § 7203 for the 2012, 2013, 2014, and 2015 tax years. *See* Superseding Indictment.

On July 6, 2021, Mr. Freeman filed a motion to dismiss Count Three of the Superseding Indictment. *See* Mot. to Dismiss, ECF No. 41 (July 6, 2021). In response, the Government filed a memorandum in opposition on July 29, 2021. *See* Gov't Opp'n to Def.'s Pretrial Mot. [Doc. #41] to Dismiss Count Three of the Superseding Indictment on Statute of Limitations Grounds, ECF No. 45 (July 29, 2021). On August 12, 2021, Mr. Freeman filed a reply in further support of his motion to dismiss. *See* Reply Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF No. 50 (Aug. 12, 2021). The Government filed a sur-reply thereafter. *See* Gov't Surreply to Def.'s

Pretrial Mot. [Doc. #41] to Dismiss Count Three of the Superseding Indictment on Statute of Limitations Grounds, ECF No. 61 (Oct. 17, 2021).

On September 30, 2021, Mr. Freeman filed a motion *in limine* regarding the admissibility of records from a state grievance committee proceeding. *See* Mot. *in Limine*, ECF No. 53 (Sept. 30, 2021). The Government filed a response to that motion on October 8, 2021. *See* Gov't Resp. to Def.'s Pretrial Mot. *in Limine*, ECF No. 55 (Oct. 8, 2021).

On October 11, 2021, the Court convened a status conference with the parties and scheduled a pretrial conference. *See* Min. Entry, ECF No. 56 (Oct. 11, 2021).

On October 14, 2021, the parties filed pretrial memoranda. *See* Trial Memo, ECF No. 59 (Oct. 14, 2021); Trial Memo, ECF No. 60 (Oct. 14, 2021).

On October 18, 2021, the Court held a pretrial conference with the parties, including a motion hearing as to the outstanding pretrial motions. *See* Min. Entry, ECF No. 64 (Oct. 18, 2021).

On October 19, 2021, the Court issued a ruling and order denying Mr. Freeman's motion to dismiss Count Three of the Superseding Indictment as well as his motion *in limine* to exclude records related to the state grievance proceeding. *See* Ruling and Order on Mot. to Dismiss and Mot. *in Limine*, ECF No. 65 (Oct. 19, 2021).

The Court held a bench trial on October 20, October 21, October 25, October 26, October 28, and November 1, 2021. *See* Min. Entries, ECF Nos. 67–70, 72. During the trial, fifteen witnesses testified: Delilah St. John, *see* Tr. of Proceedings at 6:13–62:23, ECF Nos. 74, 75, 76, 77, 78, 79 (collectively, "Tr."); Christine Mathis, *id.* at 65:10–86:10; Internal Revenue Service ("IRS") Special Agent Sara Hamilton, *id.* at 87:8–142:10, 683:2–731:18, 741:21–770:17, 918:4–946:19, 1417:9–1447:3; Luz Russell, *id.* at 144:5–177:18; Salvatore Hazel, *id.* at 179:15–230:21;

Cheryl L. Garcia, *id.* at 236:22–358:17; IRS Special Agent Kathryn Franson, *id.* at 359:8–399:12, 558:11–604:20, 793:3–854:8, 949:2–962:25; Javon Overstreet, *id.* at 401:15–447:1; Jennifer Volturno, *id.* at 447:14–482:2; Elizabeth Rowe, *id.* at 501:24–557:14; Shantelle Varrs, *id.* at 606:1–681:8; Dwayne Cushing, *id.* at 771:6–792:14; Kenneth Sweeney, *id.* at 855:13–915:8; Deron Freeman, *id.* at 981:4–1174:17, 1177:6–1385:4; and Jason Sucoll, *id.* at 1385:25–1414:10. Two-hundred and twenty-eight (228) exhibits were admitted.

On November 5, 2021, following the submission of evidence, the Court set a post-trial briefing schedule, with initial briefs due by December 14, 2021 and any replies due by January 11, 2022.

On December 14, 2021, both parties submitted post-trial memoranda. *See* Def.'s Post-Trial Br. in Supp. of Acquittal, ECF No. 81 (Dec. 14, 2021) ("Def. Mem."); Gov't Post-Trial Mem., ECF No. 80 (Dec. 14, 2021) ("Gov't Mem.").

On January 19, 2022, following an extension of time, *see* Order, ECF No. 83 (Jan. 2, 2022), both parties submitted responses to the opposing parties' post-trial briefs, *see* Def.'s Post-Trial Reply Br. in Supp. of Acquittal, ECF No. 85 (Jan. 19, 2022) ("Def. Reply"); Gov't Reply to Def. Freeman's Post-Trial Mem., ECF No. 84 (Jan. 19, 2022) ("Gov't Reply").

On March 15, 2022, the Court held closing arguments. *See* Min. Entry, ECF No. 89 (Mar. 15, 2022).

## II.     FINDINGS OF FACT

Mr. Freeman is a self-employed attorney in Hartford, Connecticut, who specializes in personal injury law. Tr. 981:12–24, 990:7–12. Mr. Freeman has practiced law in Connecticut since 2000 and has run his own practice since approximately 2006. *Id.* at 981:12–988:1.

Following his graduation from Western New England College School of Law in 2000, Mr. Freeman joined the law practice of his father, Donald Freeman. *Id.* at 986:1–8. In or around 2006, Mr. Freeman opened a separate law practice, in his own name. *Id.* at 987:2–988:6. Even as an independent practitioner, Mr. Freeman at times shared office space with his father and his brother, Justin Freeman, *see, e.g.*, *id.* at 408:4–409:14, and ultimately inherited his father's Interest on Lawyers Trust Accounts ("IOLTA") account at Webster's Bank ("Webster IOLTA"), *id.* at 1014:7–1017:10.[2]

Initially, Mr. Freeman focused his practice on criminal defense and real estate closings. *Id.* at 989:2–990:12. Following a market collapse in late 2007, however, Mr. Freeman's business suffered, and, in 2008, Mr. Freeman declared bankruptcy. *Id.* Thereafter, Mr. Freeman began focusing his practice on personal injury law. *Id.* This practice initially yielded only a fraction of the income Mr. Freeman declared before 2007. *Compare* GX 20 ("Account Tr. 2006") (reporting adjusted gross income of $206,274.00 in 2006), *with* GX 21 ("Account Tr. 2007") (reporting adjusted gross income of $52,623.00 in 2007); GX 22 ("Account Tr. 2008") (reporting adjusted gross income of $66,227.00 in 2008); and GX 23 ("Account Tr. 2009") (reporting adjusted gross income of $51,007.00 in 2009).

Between 2006 and 2010, Mr. Freeman fell severely behind on his tax payments and failed to pay his overdue tax balance, despite multiple notices of delinquent taxes and the imposition of payment and interest by the IRS. *See* Account Trs. 2006, 2007, 2008, 2009. At the close of the 2007 tax year, Mr. Freeman did not pay his taxes by the deadline of April 15, 2008. *See* Account

---

[2] This IOLTA account was registered with the statewide bar counsel, as required for attorneys at the time of registration. GX 165; *see also* Tr. 510:5–19 (testimony by Elizabeth Rowe, Connecticut bar counsel, regarding Webster IOLTA account).

Tr. 2007. At the close of the 2008 tax year, Mr. Free again did not pay his taxes by the due date of April 15, 2009. *See* Account Tr. 2008.

In July of 2010, after Mr. Freeman failed, once again, to pay his taxes from the previous year by the annual deadline and failed to otherwise satisfy his overdue tax obligations, the IRS initiated a collection action against Mr. Freeman for the 2007, 2008, and 2009 tax years. Account Trs. 2007, 2008, 2009.

## A. Tax Year 2011

### 1. Earnings, Expenditures, and Tax Payments

Between 2011 and 2013, Mr. Freeman's personal injury practice grew substantially. *See* Tr. 1144:117–1147:20. During that period, Mr. Freeman managed to handle two to three settlements per week. *Id*. at 1147:10–20. His earnings, accordingly, grew considerably, and, in a credit application with Ameriprise Financial signed on May 18, 2011, Mr. Freeman estimated his individual annual income as $300,000.00. GX 125; *see also* Tr. 799:12–802:10 (testimony by IRS Special Agent Franson regarding subpoenaed records from Ameriprise Financial for Deron Freeman).

Still, Mr. Freeman made only partial payments towards his taxes, if any. In early 2011, Mr. Freeman made several initial, estimated tax payments—his first tax payments of almost any kind since 2007.[3] *See* Account Tr. 2010 at 1–2 (estimated tax payment of $5,000.00 on January 18, 2011 and $10,000.00 on March 21, 2011); *see also* Account Trs. 2007, 2008, 2009. Then, on June 8, 2011, Mr. Freeman paid $12,751.52 towards his overdue tax balance from the 2007 tax year. Account Tr. 2007 at 2. Still, Mr. Freeman's tax balance remained substantial, and, in 2011,

---

[3] For the 2007, 2008, and 2009 tax years, Mr. Freeman had made only one miscellaneous payment previously of $10.15 on June 29, 2010, *see* Account Tr. 2007 at 2, while otherwise making no payments at all, *see* Account Trs. 2007, 2008, 2009.

the IRS began to levy and seize Mr. Freeman's assets. GX 1 (timeline of IRS activity and expenditures by year); *see also, e.g.*, Account Tr. 2007 at 2 (levy payments on August 12, 2011 and August 16, 2011). Thereafter, on September 30, 2011, Mr. Freeman entered into an installment agreement with the IRS to address his remaining overdue tax balance, and, in the interim, the IRS maintained the liens on Mr. Freeman's property. GX1; *see also* Account Tr. 2008 at 2; Account Tr. 2009 at 2.

After the IRS issued tax liens, Mr. Freeman began, over a six-month period, to deposit substantial funds from his law practice—over $400,000 in total—into a bank account under the name of Javon Overstreet (the "Overstreet Account").[4] *See* GX 97 (2011 Overstreet Account Statements); GX 98 (Overstreet Account deposits 2011); GX 99 (Overstreet Account statements 2012); GX 101 (Overstreet Account deposits 2012); *see also* Tr. 1184:19–1186:3 (testimony by Deron Freeman regarding deposits into Overstreet Account). At trial, Mr. Freeman testified that he did so to ensure that the "IRS could[] [not] take the money" that he required to run his firm, while issuing liens on his accounts. Tr. 1183:12–1184:2, *see also id.* at 1185:25–1186:20 (Mr. Freeman confirms putting money into the Overstreet Account for "a six-month period . . . to hide it from the IRS"); *id.* at 1087:25–1189:20 (additional testimony by Deron Freeman regarding use of the Overstreet Account).

After the 2011 tax year, Mr. Freeman paid off the debt owed under the installment agreement with the IRS, and accordingly, the IRS removed the liens from Mr. Freeman's property. Account Tr. 2007 at 3; Account Tr. 2008 at 3; Account Tr. 2009 at 2. In anticipation of the IRS removing liens on his assets, Mr. Freeman removed his funds from the Overstreet

---

[4] Mr. Freeman's law firm and business had no formal association with Javon Overstreet, a childhood friend of Mr. Freeman, but, at times, Mr. Freeman shared office space with Mr. Overstreet in Hartford. Tr. 984:21–985:12, 1087:21–1089:20, 1184:19–1185:19.

Account. *See* GX 100 at 16 (cashier's check from the Overstreet Account to Deron Freeman for $248,270.00 on May 30, 2012); *see also* Tr. 1088:6–1090:7 (testimony by Mr. Freeman that he kept funds in the Overstreet Account until he felt he had "sufficient money to pay off the IRS taxes that [he] owed to stop the levies and the liens").

### 2. 2011 Tax Return

At the close of the 2011 tax year, Shantelle Varrs prepared Mr. Freeman's 2011 tax return. GX 26; Tr. 640:17–641:12. Ms. Varrs is a tax preparer with a Master of Business Administration and a background in accounting, who was a social acquaintance of Mr. Freeman. *See* Tr. 606:20–608:4 (testimony by Ms. Varrs regarding her educational and professional background); *id.* at 614:20–615:1 (testimony by Ms. Varrs indicating how she met Deron Freeman, who was a "friend of [Ms. Varrs's] husband"). At the time she began preparing Mr. Freeman's tax returns, Ms. Varrs worked full-time for the State of Connecticut and prepared returns for a small number of friends and family in her spare time. *See id.* at 613:6–615:1.

Mr. Freeman provided Ms. Varrs with the 1099 Forms and gross receipts that she required to complete the tax return,[5] as well as access to his IRS records. *Id.* at 215:13–22, 630:1–7, 664:6–665:1, 1038:5–1039:5. Mr. Freeman also provided Ms. Varrs with access to all of the law firm's records, and she worked regularly at his law firm's office. *Id.* at 1037:7–1038:2 (testimony by Mr. Freeman that Ms. Varrs would come to his office "after the day job, sit at the desk, on my computer with unfettered access to everything in my office"); *id.* at 1062:22–1063:2 (testimony by Mr. Freeman that his employees were authorized to provide accountants with any

---

[5] In the 2011 tax year, Mr. Freeman's law practice generated no more than forty Form 1099s. GX 26B. At trial, Delilah St. John testified that, when 1099s would arrive in the mail, she would place them either on "[Mr. Freeman's] chair" or "in his inbox." Tr. 47:15–24.

documents requested). Mr. Freeman's office, Ms. Varrs testified, was full of "files everywhere" and was, to put it mildly, a "mess." *Id.* at 659:5–13.

In the 2011 tax return, Mr. Freeman declared his annual net profit as $147,020.00 and taxable income as $76,759.00.[6] *See* GX 26 (lines 12, 43). Mr. Freeman declared his gross receipts as totaling $308,600.00. GX 26 (Schedule C, line 1b); *see also* Tr. 641:23–642:10.

The IRS determined that $275,908.01 in gross receipts had not been reported on Mr. Freeman's 2011 tax return. GX 2. With all gross receipts included, Mr. Freeman's net profit totaled $422,928.01 in the 2011 tax year, and his taxable income totaled $352,941.01. *Id.*; GX 7.

Mr. Freeman failed to file the 2011 tax return by the due date of April 15, 2012, or after an extension, by October 15, 2012. Account Tr. 2011 at 1–2. Mr. Freeman signed the 2011 tax return, under penalties of perjury, on March 12, 2013. GX 26 at 2. The tax return was filed on March 17, 2013. *Id.* at 1.

Based on the income declared in the tax return, Mr. Freeman owed $30,364.00 in taxes. Account Tr. 2011. This amount was not paid by the due date, resulting in penalties and interest. *Id.* The full balance, including penalties and interest, was not paid until over four years later. *Id.*; *see also* GX 8.

### B. Tax Year 2012

#### 1. Earnings, Expenditures, and Tax Payments

In the 2012 tax year, Mr. Freeman's business continued to grow. That year, he deposited over one million dollars in earnings from his firm into a new IOLTA account at People's United

---

[6] To calculate Mr. Freeman's income on the tax returns she prepared, Ms. Varrs "[took] a third" of Mr. Freeman's gross receipts and settlements reported in 1099 Forms. Tr. 629:23–632:3. She admitted at trial that this was not "the most accurate way" to prepare a tax return. *Id.* at 668:23–669:2. [7] In contrast to the Webster IOLTA, Mr. Freeman did not register the People's IOLTA account with the statewide bar counsel. GX 165; *see also* Tr. 513 (testimony by Elizabeth Rowe, Connecticut bar counsel, regarding registration of People's IOLTA).

Bank ("People's IOLTA"),[7] in addition to earnings deposited into his original, Webster IOLTA account, *see* GX 74 (People's IOLTA 2012 statements); GX 4A (summary of insurance company checks deposited into Webster IOLTA); GX 4B (summary of insurance company checks deposited into People's IOLTA).

These earnings, however, did not translate into timely tax payments. Following a payment of $16,000.00 in June 2012,[8] Mr. Freeman made only four voluntary payments to the IRS before the end of the 2015 tax year: $7,761.00 on August 19, 2013 for the delinquent 2011 tax balance; $5,000.00 on April 19, 2014 for the delinquent 2013 tax balance; $11,000.00 on October 1, 2014 for the delinquent 2012 tax balance; and $10,000.00 on June 13, 2015 for the delinquent 2015 tax balance, *see* GX 1 at 2–4; GX 26A ("Account Tr. 2011"); GX 27A ("Account Tr. 2012"); GX 28A ("Account Tr. 2013"); GX 29 ("Account Tr. 2014"); GX 30 ("Account Tr. 2015").

Meanwhile, Mr. Freeman purchased a number of luxury items. On July 13, 2012, Mr. Freeman paid $17,394.67 for a 2012 Bombardier jet ski. GX 1 at 2; GX 249 (check from Mr. Freeman to Connecticut Power and Sport for purchase of jet ski). Then, in September of 2012, Mr. Freeman paid a total of $100,000 for a 34-foot 2007 Crownline 340 CR boat. GX 1 at 2; GX 146 at 1–2 (checks from Mr. Freeman to Seaboard Marina for purchase of Crownline boat).

Mr. Freeman also purchased, for $142,000.00, a plot of land at 120 Main Street in Glastonbury, Connecticut ("120 Main Street"). GX 1 at 2; GX 140 (Town of Glastonbury permit to build at 120 Main Street). This site became the location of Mr. Freeman's new, 13,610-square-

---

[7] In contrast to the Webster IOLTA, Mr. Freeman did not register the People's IOLTA account with the statewide bar counsel. GX 165; *see also* Tr. 513 (testimony by Elizabeth Rowe, Connecticut bar counsel, regarding registration of People's IOLTA).

[8] This payment applied to the delinquent 2009 tax balance. *See* GX 1 at 2; Account Tr. 2009 at 2.

foot, luxury home. *See* GX 178 at 2 (property assessment card for 120 Main Street listing purchase price as $142,00.00).

### 2. 2012 Tax Return

At the close of the 2012 tax year, Ms. Varrs again prepared Mr. Freeman's tax return.[9] *See* Tr. 645:23–646:9; GX 27 at 2 (Shantelle Varrs indicated as third-party designee on 2012 tax return). In this 2012 tax return, Mr. Freeman declared his annual net profit as $150,277.00 and annual taxable income as $64,911.00. *See* GX 27 (lines 12, 43). Mr. Freeman declared his gross receipts as totaling $421,857.00. GX 27 (line 1, Schedule C).

The IRS determined that $166,466.76 in gross receipts had not been reported on Mr. Freeman's 2012 tax return. GX 2. With all gross receipts included, Mr. Freeman's net profit totaled $316,743.76 in the 2012 tax year, and his taxable income totaled $231,509.76. *Id.*; GX 7.

Mr. Freeman failed to file the 2012 tax return by the due date of April 15, 2013, or, after an extension, by October 15, 2013. Account Tr. 2012. Mr. Freeman signed the 2012 tax return, under penalties of perjury, on December 3, 2013. GX 27 at 2. The tax return was filed on February 24, 2014. Account Tr. 2012.

Based on the income declared in the tax return, Mr. Freeman owed $27,736.00 in taxes. Account Tr. 2012. This amount was not paid by the due date, resulting in penalties and interest. *Id.* The full balance, including penalties and interest, was not paid for over three years. *Id.*; *see also* GX 8.

### C. Tax Year 2013

#### 1. Earnings, Expenditures, and Tax Payments

---

[9] In the 2012 tax year, Mr. Freeman's income from settlements resulted in no more than forty-four (44) Form 1099s. *See* GX 27B.

In 2013, Mr. Freeman began a major construction project at 120 Main Street. Between October 22 and December 23, 2013, Mr. Freeman paid over $100,000 to begin construction on a custom-designed house, which would eventually include an indoor pool, geothermal heating system, sound system, and marble tile flooring. GX 5B; Tr. 875:16–889:21 (testimony by Kenneth Sweeney regarding layout of house at 120 Main); *see also* GX 106 (payments to Schneider's Flooring); GX 110A (payments to Natural Audio); GX 179A (summary of payments to Kenneth Sweeney/K&S Construction from Deron Freeman bank accounts); GX 179C (summary of expenditures on 120 Main Street excluding payments to Kenneth Sweeney/K&S Construction).

To assist in financing this project, Mr. Freeman obtained a loan from his brother, Justin Freeman, for $1.1 million dollars, at an interest rate of ten percent (10%), in August 2013. DX 530; Tr. 111:20–112:8 (testimony by IRS Special Agent Hamilton regarding loans from Justin Freeman to Deron Freeman); GX 152 ¶ 97 (notes from IRS Special Agent Hamilton Interview with Deron Freeman). Mr. Freeman used this money, in addition to other funds he borrowed from his brother in later years,[10] to complete the property at 120 Main Street.[11] Tr. 111:20–112:8.

---

[10] At trial, Mr. Freeman did not testify as to the amount he borrowed from his brother after the $1.1 million loan; rather, he said that Justin Freeman had given him a "substantial" amount of money. Tr. 1079:1–25. In an interview with IRS Special Agent Hamilton, Mr. Freeman stated that he had borrowed $500,000 "over the past few years." GX 152 ¶ 97; Tr. 111:20–112:8. Mr. Freeman also told Special Agent Hamilton that Justin Freeman loaned him an additional $250,000 a few months before their interview in 2018, which he had used "to make his tax payments." GX 152 ¶ 97

[11] Mr. Freeman testified that he also used the money from his brother to pay his taxes and to fund several attempted business investments, which ultimately failed—for example, Mr. Freeman's investment in a bar in downtown Hartford called Coaches.[11] Tr. 1079:1–25; *see also id*. at 992:19–993:6 (testimony by Mr. Freeman that various business investments "did[] [not] yield any returns other than [ ] networking"). To date, Mr. Freeman has not repaid his brother in full. *Id*. at 1079:20–1080:3 (testimony by Deron Freeman that he still owes his brother a lot of money, "[a]pproximately five hundred grand").

Mr. Freeman's spending, however, was not limited to the construction project. That year, he also purchased a 2012 Sea-Doo Speedster for $23,074.00. *See* GX 250 (application for Sea-Doo Speedster vessel registration); *see also* Tr. 957:12–25 (testimony by IRS Special Agent Franson regarding price of Sea-Doo Speedster); *id*. at 1204:2–7 (testimony by Mr. Freeman confirming payment for Sea-Doo Speedster in 2013). Then, in March of 2013, Mr. Freeman paid a down payment of $52,971.96 to lease a 2011 Ferrari, minus the trade-in value of Mr. Freeman's Bentley. *See* GX 130 (Ferrari lease agreement); *see also* Tr. 807:18–808:21 (IRS Special Agent Franson describes Ferrari lease agreement). In the lease application, Mr. Freeman represented his "annual salary or wages" as $450,000. GX 131; *see also* GX 9 (comparison of income reported on credit applications to total income declared on Forms 1040).

Meanwhile, Mr. Freeman continued to fail to pay his taxes on time, or otherwise pay off his mounting tax debt, despite notice from the IRS regarding his delinquent 2011 taxes, as well as penalties and interest imposed*. See* Account Trs. 2011, 2012.

At the same time, that year, Mr. Freeman faced grievance proceedings in Connecticut Superior Court, which required him to submit to an audit by the Statewide Grievance Committee regarding the Webster IOLTA account. GX 167 (Connecticut Superior Court order dated December 27, 2013); GX 168 (letter to Deron Freeman from the Statewide Grievance Committee on January 9, 2014 regarding monthly audit requirement).[12] As a result of the Statewide Grievance Committee audit, Mr. Freeman began a project of reconciling the Webster IOLTA. Tr. Tr. 1014:1–9, 1256:19–23. Mr. Freeman and a bookkeeper, Kim Ponticelli, spent "hundreds" of

---

[12] The Court takes judicial notice of the existence of documents from the Statewide Grievance Committee proceeding, including those documents issued by the State of Connecticut before the proceeding in Connecticut Superior Court, but does not take judicial notice of the documents for the truth of the matters asserted. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.").

hours on the reconciliation, working "nights, weekends[,] for months and months painstakingly putting as much data into Quickbooks" as possible. *Id.* at 1014:18–1016:13. To complete this task, Mr. Freeman reconciled not only his past transactions in the Webster IOLTA account, but also those of his father and brother. *See id.* at 1014:1–1017:10.

Between 2012 and the close of the subsequent tax year, Mr. Freeman had made only one payment of $7,761.00, towards his 2011 tax balance of $30,364.00.[13] *See* Account Tr. 2011. He made no payments at all towards his 2012 tax obligations. Account Tr. 2012.

## 2. 2013 Tax Return

At the close of the 2013 tax year, Ms. Varrs again assisted in the preparation of Mr. Freeman's tax return.[14] *See* Tr. 648:10–649:24; 656:9–13. While preparing the tax return, Ms. Varrs sent an e-mail to Mr. Freeman reminding him to "make payments" and expressing concern about his declared income. *See* DX 540. She stated that she was "not sure" if the return would be "okay" because Mr. Freeman's income did not exceed $350,000. *Id.* At trial, Mr. Freeman testified that it was important for him to show an annual income of at least $350,000 "in order to get a million dollar mortgage," as a replacement for the personal loan from his brother. Tr. 1042:19–1045:25.

On the final 2013 return, Ms. Varrs did not sign either as a paid preparer or a third-party designee. GX 28 at 2. On this return, signed only by Mr. Freeman, the reported gross receipts totaled $426,313.00. *See* GX 28 (line 1, Schedule C); Tr. 217:13–20 (IRS representative Salvatore Hazel confirms gross receipts in 2013 Form 1040). He declared his annual net profit as

---

[13] Mr. Freeman originally paid this money towards the second quarter of his 2013 taxes; however, these funds were transferred to the 2011 tax year. *See* Tr. 307:2–17.

[14] Ms. Varrs did not, however, sign the return either as a paid preparer or a third-party designee. *See* GX 28 at 2.

$225,768.00 and annual taxable income as $163,013.00, *see* GX 28 (lines 12, 43); *see also* Tr. 821:3–8 (IRS Special Agent Kathryn Franson confirms income listed on 2013 Form 1040). With a declared income of less than $350,000, Mr. Freeman did not secure the mortgage he desired. Tr. 1045:9–25.

The IRS determined that $508,011.22 in gross receipts had not been reported on Mr. Freeman's 2013 tax return. GX 2. With all gross receipts included, Mr. Freeman's net profit totaled $733,779.22 in the 2013 tax year, and his taxable income totaled $685,849.22. *Id.*; GX 7.

Mr. Freeman failed to file the 2013 tax return by the due date of April 15, 2014, or, after an extension, by October 15, 2014. Account Tr. 2013. Mr. Freeman signed the 2013 tax return, under penalties of perjury, on October 13, 2014. GX 27; Tr. 1094:9–19. The tax return was filed on October 16, 2014. Account Tr. 2013.

### 3. The 2013 Amendment

A few years later, in 2015, a new tax preparer for Mr. Freeman, Bruce Scotti, alerted Mr. Freeman about potential inaccuracies in his 2013 tax return.

On January 5, 2015, Mr. Scotti sent Mr. Freeman the following e-mail:

> Good morning Deron, I reviewed your tax return yesterday. I find it
> hard to believe that only 400K was deposited into the Iolata[15] [sic]
> account in 2013, more likely that was the amount deposited into the
> operating account as income. This . . . will not match IRS records of
> 1099's being issued and makes this return trigger an audit. My asap

---

[15] The Government has noted that, in this e-mail, Mr. Scotti referred only to a single IOLTA account, i.e., the Webster IOLTA account, although Mr. Freeman continued to use the People's IOLTA account until June 24, 2013. Gov't Mem. at 36. At trial, Mr. Freeman presented e-mail correspondence from 2014 and 2015 suggesting that Mr. Scotti knew about two IOLTA accounts. *See* DX 550 ("The two Ilolta [sic] accounts are completely done . . . ."); DX 560 ("In order to find carry forward deposits with payments in 2014 we will need both Iolta accounts for 2013[.]"). Mr. Freeman also testified that he "[d]efinitely did not know" that Mr. Scotti was only using the Webster IOLTA to calculate the amended 2013 return, Tr. 1317:9, and, further, presented evidence that Mr. Scotti had access to the People's IOLTA Account based on a Quickbooks record produced by Mr. Scotti to IRS Special Agent Hamilton, *see* DX 573; *see also* Tr. 758:11–759:13 (IRS Special Agent Hamilton testimony regarding DX 573). In response, the Government has asserted that, at the time Mr. Freeman was working with Mr. Scotti and discussing the 2014 return with him, he was using two IOLTAs, but the People's IOLTA was not one of them, as it had been closed in May of 2013, *see* Gov't Reply at 22–24; *see also* Tr. 1191:17–20 (testimony by Mr. Freeman confirming that the People's IOLTA account was closed "around June 24th of 2013").

> suggestion is as follows, we should do a quick fix to cut time and cost, it would be 4 spread sheets, gross revenues into Iolta, gross client pay outs from Iolata [sic], pay outs to you into operating compared to gross deposits into operating. We then amend the return to make these changes so the gross revenues match IRS reported amounts. It should not change the bottom line of tax owed.

DX 545.

With Mr. Freeman's permission, Mr. Scotti prepared an amendment to the 2013 return.[16] *See* DX 546; *see also* Tr. 1053:3–16 (testimony by Mr. Freeman about agreement with Mr. Scotti to amend the 2013 tax return). The return reflected an adjusted gross income of $404,587.00; taxable income of $369,574.00; gross receipts of $1,629,245.00; and additional taxes owed of $70,536.00. DX 546.

The reported gross receipts in the amendment prepared by Mr. Scotti were a substantial correction from the original version—yet, even that supposedly corrected amount omitted approximately $1 million in gross receipts deposited in 2013 into the People's IOLTA account. *Compare* GX 310 at 9 (total deposits into Webster IOLTA of $1,629,244.58),[17] *with* GX 546 (amended return declaring gross receipts as $1,629,245.00, Schedule C); GX 4B at 3 (summary of insurance company checks deposited into People's IOLTA in 2013); *see also* Tr. 1423:22–1431:18 (testimony by IRS Special Agent Hamilton regarding reconciliation of Webster IOLTA, People's IOLTA, and amended 2013 return).

According to IRS records, the amended return was never filed.[18] *See* Account Tr. 2013.

---

[16] The preparer named on the amended return produced by the Defendant is James Foley. *See* DX 566. According to Mr. Freeman, James Foley worked with Bruce Scotti as a CPA. Tr. 1054:19–1055:1.

[17] IRS Special Agent Hamilton testified at trial that this exhibit, which was produced from Mr. Scotti's records, pertained to the Webster IOLTA account. Tr. 1423:22–1424:5, 1438:24–1439:12.

[18] The 2014 return was mailed directly to the IRS from Mr. Scotti. *See* GX 29A at 10 (envelope); Tr. 1075:10–1076:13. Mr. Freeman stated that it was his understanding that Mr. Scotti would file the 2013 amended return and the 2014 return at the same time. *Id.* at 1053:16–25.

Based on the income in the 2013 tax return, without the amendment, Mr. Freeman owed $59,158.00 in taxes. GX 28; Account Tr. 2013. This amount was not paid by the due date, resulting in penalties and interest. Account Tr. 2013. The full balance, including penalties and interest, was not paid until over two years later. *Id.*

### D. Tax Year 2014

#### 1. Earnings, Expenditures, and Tax Payments

In the subsequent tax year, Mr. Freeman's expenditures on the house at 120 Main Street saw an "uptick." Tr. 934:5–9. Between February and November of 2014, Mr. Freeman made over $200,000 in payments to his contractor and sub-contractors for construction of the house. *See* GX 1 at 3–4 (summary of 2014 expenditures and IRS activity); GX 179A (summary of payments to Kenneth Sweeney/K&S Construction from Deron Freeman bank accounts); GX 179C (summary of 120 Main Street expenditures not including payments to Kenneth Sweeney). In the same year, Mr. Freeman's brother, Justin Freeman, separately paid the contractor on the house, Kenneth Sweeney, over $1 million. *See* GX 179B (summary of payments from Justin Freeman to Kenneth Sweeney).

Meanwhile, the IRS continued to inform Mr. Freeman of his overdue tax obligations, to little effect. *See* Account Tr. 2011 (Notice CP71C reminder of past due tax, penalties, and interest for 2011 tax year). Mr. Freeman paid only $16,000.00 towards his overdue tax balance that year. *See* GX 1; *see also* Account Tr. 2014 (no estimated payments towards 2014 taxes in 2014 tax year); Account Tr. 2013 (partial payment of $5,000.00 on 2013 taxes on April 19, 2014); Account Tr. 2012 (partial payment of $11,000.00 on 2012 taxes on October 1, 2014).

#### 2. 2014 Tax Return

At the close of the 2014 tax year, Mr. Scotti prepared Mr. Freeman's tax return. *See* GX 29A at 2. In the 2014 tax return, Mr. Freeman declared his annual taxable income as totaling $612,634.00. *See* GX 29A. He declared his gross receipts as totaling $3,277,331.00. GX 29A (line 1, Schedule C).

Mr. Freeman failed to file the 2014 tax return by the due date of April 15, 2015, or, after an extension, by October 15, 2015. GX 29 ("Account Tr. 2014"). Mr. Freeman signed the 2014 tax return, under penalties of perjury, on March 3, 2016. GX 29A at 2. The tax return was filed on March 7, 2016. Account Tr. 2014.

Based on the income reported in the 2014 tax return, Mr. Freeman owed $151,510.00 in taxes. Account Tr. 2014; GX 29A. This amount was not paid by the due date, resulting in penalties and interest. Account Tr. 2014. The full balance, including penalties and interest, was not paid until over two years later. *Id.*

### E. Tax Year 2015

#### 1. Earnings, Expenditures, and Tax Payments

In 2015, Mr. Freeman started to express concern to Mr. Scotti about his overdue taxes and late tax returns. On March 6, 2015, Mr. Freeman sent an e-mail to Mr. Scotti asking about the status of his 2014 tax return, as well as his 2013 amendment. *See* DX 547. Then, on March 26, 2015, he informed Mr. Scotti that he wanted to make a payment for payroll and income tax. DX 549. On June 13, 2015, Mr. Freeman paid $10,000 in taxes, an estimated payment towards his tax payments that year. *See* GX 30 at 2 ("Account Tr. 2015").

Mr. Freeman, however, made no other estimated payments, or payments towards his overdue tax balance that year, despite notices sent by the IRS on October 15, 2015 that additional payment was required. *See* Account Trs. 2011, 2012, 2013 (CP71C reminders of past due tax,

penalties, and interest for 2011, 2012, and 2013 tax years); Account Tr. 2014 (no payments in 2015). Mr. Freeman received these notices. *See* DX 552 (email from Mr. Freeman to Mr. Scotti on October 27, 2015: "Bruce I am getting some letters from the Irs [sic]. Can we meet?").

Meanwhile, Mr. Freeman continued to invest hundreds of thousands of dollars in the house at 120 Main Street. In 2014, he paid his contractor, sub-contractors, and suppliers over $400,000. *See* GX 1 at 4–5 (summary of 2015 expenditures); GX 179A (summary of payments to Kenneth Sweeney/K&S Construction from Deron Freeman bank accounts); GX 179C (summary of 120 Main Street expenditures not including payments to Kenneth Sweeney).

### 2. 2015 Tax Return

At the close of the 2015 tax year, Mr. Scotti prepared Mr. Freeman's tax return. *See* GX 30A at 2; GX 152 ¶ 81. In this tax return, Mr. Freeman declared his annual taxable income as $693,375.00. *See* GX 30A at 2. He declared his gross receipts as totaling $5,176,378.00. GX 30A at 13 (line 1, Schedule C).

Mr. Freeman failed to file the 2015 tax return by the due date of April 15, 2016, or after an extension to October 15, 2016. Account Tr. 2015. The tax return was filed on October 16, 2016. *Id.*

Based on the income reported in the 2015 tax return, Mr. Freeman owed $266,008.00 in taxes. Account Tr. 2015; GX 30A. This amount was not paid by the due date, resulting in penalties and interest. Account Tr. 2015. The full balance, including penalties and interest, was not paid until 2019. *Id.*

### F. Subsequent Years

On April 20 and 21, 2016, IRS Special Agent Hamilton interviewed Justin Freeman as part of an ongoing criminal investigation, which followed a civil audit in 2013. Tr. 1432:1–

1433:15 (testimony by IRS Special Agent Hamilton regarding civil and criminal investigations of Justin Freeman).

In the weeks after the interview, Mr. Freeman became increasingly concerned about his tax obligations, repeatedly asking Mr. Scotti about a potential payment plan, as well as his late tax returns and tax payments to the IRS. *See, e.g.*, DX 557 (e-mail from Mr. Freeman to Mr. Scotti on May 10, 2016 stating: "Bruce I still do not have a response from the IRS regarding the payment plan, is there anyway [sic] you can check on this please?"); DX 558 (e-mail from Mr. Freeman to Mr. Scotti on May 26, 2016 stating: "Bruce, please let me know asap about payment plan, removal of late file fee and I also need 2015 tax returns . . ."); DX 559 (e-mail from Mr. Freeman to Mr. Scotti on June 1, 2016 stating: "Bruce, I have a Drs [sic] bill for 50k, I have no idea what that's from. Also have you made any progress with payment plan? When can I expect 2015 taxes to be done and penalty removed?"); DX 560 (e-mail from Mr. Freeman to Mr. Scotti on June 9, 2016 stating: "Bruce I just got off the phone with the IRS . . . . Can you please help, I am going online now to pay the outstanding balances. They have assigned a field agent apparently but they cannot tell me who. They say the field agent has to establish payment plan. What should I do? Can you help me?").

Mr. Scotti did not respond with the same sense of urgency. *See, e.g.*, DX 556 (e-mail from Bruce Scotti to Deron Freeman about whether to send a payment to the IRS stating that "[u]ntil we get a registered letter of Notice of Intent to Levy we are ok"). Nevertheless, Mr. Freeman contacted the IRS directly to attempt to obtain an installment agreement. *See* DX 575; Tr. 1442:18–1444:15 (testimony by IRS Special Agent Hamilton regarding record of Mr. Freeman's call to IRS call center on April 5, 2016).

Then, on June 8, 2016, the IRS sent Mr. Freeman notice of its intent to again lien and

seize Mr. Freeman's assets. *See* Account Tr. 2013 at 2 (collection due process notice of intent to

levy). Mr. Freeman became "frantic." Tr. 1065:5. He reached out to Bruce Scotti by e-mail

again:

> Bruce, please send me the reconciliation reports. In addition Doreen
> seems to be increasingly agitated. I will forward her latest
> correspondence. We need to meet with her asap. She has already
> placed liens on my property, I thought we were going to handle that?

DX 562 (email from Mr. Freeman to Mr. Scotti on August 8, 2016). In response, Mr. Scotti told

Mr. Freeman that the "IRS doesn't take houses," unless "its criminal which this is not." DX 564.

He also told Mr. Freeman to postpone a payment on taxes until September 15. *Id.*

On November 16, 2016, Mr. Freeman reached an installment agreement with the IRS for

2011, 2012, 2013, 2014, and 2015. *See* Account Trs. 2011, 2012, 2013, 2014, 2015. Under this

installment agreement, Mr. Freeman paid approximately $500,000 in tax payments through

2018, including almost $90,000 in additional interest and penalties associated with late payments

for tax years 2011 through 2015. *See* DX 534; DX 536 (showing $87,579 in IRS penalties paid

by Mr. Freeman); *see also* Account Trs. 2011, 2012, 2013, 2014, 2015.

On May 3, 2018, IRS Special Agent Sara Hamilton visited Mr. Freeman and conducted

an interview with him. *See* GX 152; *see also* Tr. 88:10–142:6 (IRS Special Agent Hamilton

testimony regarding interview with Deron Freeman on May 8, 2018). Mr. Freeman agreed to

speak with her and identified his signature on the 2011, 2012, and 2013 tax returns. GX 152 ¶

28; Tr. 95:24–99:21 (testimony by IRS Special Agent Hamilton regarding Mr. Freeman's

identification of his signature on tax returns during the interview).

At the end of the interview, Mr. Freeman said that he wanted to work with the IRS. GX

152 ¶ 130. He also promised to contact IRS Special Agent Hamilton after he reviewed his

records; however, he never did. *Id.*; Tr. 122:1–8 (testimony by IRS Special Agent Hamilton regarding the conclusion of her interview with Mr. Freeman in 2018).

## III.   CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS

In the Superseding Indictment, Mr. Freeman has been charged with: (1) making and subscribing a false tax return in the 2011 tax year in violation of 26 U.S.C. § 7206(1) ("Count One"); (2) making and subscribing a false tax return in the 2012 tax year in violation of 26 U.S.C. § 7206(1) ("Count Two"); (3) failure to pay income tax in the 2012 tax year in violation of 26 U.S.C. § 7203 ("Count Three"); (4) making and subscribing a false tax return in the 2013 tax year in violation of 26 U.S.C. § 7206(1) ("Count Four"); (5) failure to pay income tax in the 2013 tax year in violation of 26 U.S.C. § 7203 ("Count Five"); (6) failure to pay income tax in the 2014 tax year in violation of 26 U.S.C. § 7203 ("Count Six"); and (7) failure to pay income tax in the 2015 tax year in violation of 26 U.S.C. § 7203 ("Count Seven").

The Court will address, first, the felony counts of making and subscribing a false tax return in the 2011, 2012, and 2013 tax years (Counts One, Two, and Four), and then the misdemeanor counts of failure to pay (Counts Three, Five, Six and Seven).

### A.  False Tax Return

The first crime with which Mr. Freeman is charged is making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). Under this federal criminal statute,

> [a]ny person who . . . [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

26 U.S.C. § 7206(1).

The elements of a § 7206(1) violation are: "(1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalty of perjury." *United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000) (internal citations omitted).

There can be no dispute as to the first, second, and fourth elements of this inquiry.[19] Mr. Freeman made and signed each of the returns in the tax years 2011, 2012, and 2013 under penalties of perjury, and each return underreported gross receipts, net profit, and taxable income by a substantial, material amount, including $276,182.01 in unreported taxable income in 2011, $166,598.76 in 2012, and $522,836.22 in 2013. GX 7; *see also* Tr. 1094:9–19 (Mr. Freeman confirms making and signing 2011, 2012, and 2013 returns under penalty of perjury). The only remaining and more challenging issue is whether Mr. Freeman filed false tax returns with the requisite state of mind.

To prove the requisite *mens rea*, the Government must prove beyond a reasonable doubt "that the defendant signed the return willfully and knowing it was false." *United States v. LaSpina*, 299 F.3d 165, 179 (2d Cir. 2002) (quoting *Pirro*, 212 F.3d at 89). "[C]arrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *United States v. D'Agostino*, 638 F. App'x 51, 52–53 (2d Cir. 2016) (summary order) (quoting *Cheek v. United States*, 498 U.S. 192, 202 (1991)). "Ultimately, 'the

---

[19] In post-trial briefing, Mr. Freeman concedes that whether he "made and subscribed a return, statement, or other document which was false as to a material matter," and whether "the return, statement, or other document contained a written declaration that it was made under the penalties of perjury," are not in dispute. Def. Mem. at 12.

issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission . . . .'" *Id.* (quoting *Cheek*, 498 U.S. at 202).

To prove the requisite *mens rea* beyond a reasonable doubt, the Government may rely on circumstantial evidence. *See United States v. Schiff*, 801 F.2d 108, 111 (2d Cir. 1986) ("[W]illfulness of one accused of tax crimes may be proved by circumstantial evidence." (internal citation omitted)), *cert. denied*, 480 U.S. 945 (1987); *United States v. MacKenzie*, 777 F.2d 811, 818 (2d Cir. 1985) ("knowledge of the law [is] inferable and proven from" particular acts of defendants), *cert. denied*, 476 U.S. 1169 (1986); *see also United States v. Libous*, 645 F. App'x 78, 81 (2d Cir. 2016) (summary order) (deferring to the factfinder's determination of the weight of the credibility of the witnesses in a tax crime bench trial, even where "[p]roof of the elements of the crimes charged [was] entirely by circumstantial evidence" (quoting *LaSpina*, 299 F.3d at 180)).

Circumstantial evidence that may support a finding that a defendant willfully violated his duty under the tax laws may include "the defendant's prior taxpaying record," *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir. 2017) (summary order) (citing *United States v. Bok*, 156 F.3d 157, 165 (2d Cir. 1998)); "educational background," *id.* (citing *MacKenzie*, 777 F.2d at 818); and "knowledge of previous court rulings against the defendant or others who relied on the defendant's theory of tax law," *id.* (citing *United States v. Schiff*, 801 F.2d 108, 112 (2d Cir. 1986)); *see also id.* (citing *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986) (defendants' continued claim of tax-exempt status after court issued judgment against them "was strong proof to rebut [the] contention that they did not knowingly do anything illegal")).

Other circumstantial evidence relevant to the intent inquiry includes whether a defendant displayed a pattern of underreporting large amounts of income, *see United States v. Koskerides*, 877 F.2d 1129, 1138 (2d Cir. 1989) (affirming judgment of conviction where "[a]ppellant's pattern of evasion over a three year period, the magnitude of the evasion . . . , and appellant's understanding and involvement in the filing of his income tax returns were sufficient to infer willfulness"); *see also United States v. Klausner*, 80 F.3d 55, 63 (2d Cir.1996) ("Patterns of understating or failing to report income are also considered evidence of willfulness."), and the use of nominees, or placing property in the name of another, *see United States v. Woodner*, 317 F.2d 649, 650–51 (2d Cir. 1963) ("The use of a nominee, the conversion to cash, lack of usual records, commingling of funds, and personal use, . . . support the inference that . . . the intent of the scheme was to conceal the receipt of the personal income in order to evade the tax due thereon."). "The Supreme Court also has indicated that, if a 'tax evasion motive plays any part' in certain conduct, an 'affirmative willful attempt' to evade taxes may be inferred from that conduct." *Klausner*, 80 F.3d at 63 (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)).

"The Court has not set limitations to the type of conduct from which willfulness can be inferred." *Id.* (citing *Spies,* 317 U.S. at 499).

The Government argues that the evidence at trial established Mr. Freeman's willfulness, where, first, the evidence showed a three-year pattern of substantial underreporting that was not "small, easily missed, or involving just a single [tax] year." Gov't Mem. at 22–23. Second, the Government argues that willfulness is established where Mr. Freeman stated at trial that he gave "serious thought" to signing his tax returns, *id.* at 23 (citing Tr. 1283:9–20), and, further, reviewed them with the benefit of legal training and experience as an entrepreneur, *id.* Third, for the 2013 tax year in particular, the Government argues that Mr. Freeman was "in a better

position than anyone to know that his 2013 tax return looked off" because, at the time he signed it in October 2014, he had begun a detailed and painstaking analysis of the Webster IOLTA in response to the Statewide Grievance Committee proceeding, *id.* at 24–26 (internal quotation marks omitted); relatedly, the Government argues that it is "inconceivable" that Mr. Freeman would not have known that the 2012 and 2013 tax returns omitted substantial gross receipts, where he deposited over $1 million in the People's IOLTA in each of those years, *id.* at 25–26.

Fourth, the Government argues that Mr. Freeman had a strong incentive to know the amount of his firm's gross receipts, as he was primarily responsible for the financial operation of his firm, which bore his name, and, further, received frequent reminders regarding the amount of money coming to the firm as a result of his personal involvement in the settlement process. *See id.* at 26–27.

Fifth, the Government argues that Mr. Freeman had "multiple sources of information" to remind him about the magnitude of the gross receipts generated by his firm, including a review of the limited number of 1099 Forms generated each year and his bank statements. *Id.* at 27–29.

Sixth, the Government argues that Mr. Freeman's statements regarding his income on his applications to creditors—for example, Ameriprise Financial and Ferrari—during the relevant period indicate knowledge of his actual income, where the reported amounts far exceeded the income reported on his tax return and much more closely approximated the income he received annually. *Id.* at 29–33.

Seventh, the Government argues that Mr. Freeman knew that the income reported on his tax returns was materially false, because his spending on items such as cars, jet skis, and his luxury home far exceeded income reported in his tax returns, even accounting for the substantial loans provided by Mr. Freeman's brother. *See id.* at 33–35.

Finally, the Government argues that Mr. Freeman's failure to file an amended return in 2013—in combination with his failure to ensure that Mr. Scotti had all relevant gross receipts to prepare the return, including those from the People's IOLTA; his failure to point out to Mr. Scotti that over $1 million in gross receipts had been left off the amended return; his failure to file the amended return; and his failure to pay the additional approximately $70,000 in taxes required under the amended return—support that Mr. Freeman knew that he had substantially larger tax obligations than those he had reported. *Id.* at 34–40.

In his defense, Mr. Freeman argues that any inference of willfulness that can be drawn from this circumstantial evidence—which Mr. Freeman describes as a "pile of false and strained inferences"—is negated by his reliance on professionals to provide him with tax advice and prepare his returns, as well as the effect that his carelessness and disorganization had on his ability to ensure the accuracy of his returns. Def. Reply at 7; Def. Mem. at 15–19. At the same time, Mr. Freeman argues that his statement of income on his credit applications, such as with Ameriprise and Ferrari, is a "red herring," where his statement of his income on those applications accurately matched his gross receipts. *See* Def. Mem. at 20–21.

Additionally, Mr. Freeman disputes that his use of the Overstreet Account demonstrates willfulness, where, according to Mr. Freeman, the use of that account merely represented a "misguided" attempt "to maintain his business and to fulfill the terms of his installment agreement with the IRS." *Id.* at 19–20. He also points to several instances of his communications with his tax preparers, including his communication in 2013 with Ms. Varrs about a concern that the income recorded on his 2013 tax return was insufficient to obtain a mortgage Mr. Freeman desired, as well as a string of communications with Mr. Scotti where Mr. Freeman sought to pay overdue taxes and repeatedly asked Mr. Scotti for help with his tax situation, to suggest that Mr.

Freeman's behavior negates any inference of willfulness that could be drawn from the Government's case-in-chief. *Id.* at 25–28.

Finally, Mr. Freeman argues that Mr. Freeman did not have the requisite *mens* rea where "there is no evidence that Mr. Freeman equated his tax liability with his ability to spend" and where the evidence at trial, in Mr. Freeman's view, established that he did not hide assets from his preparers but rather that Mr. Freeman disclosed the People's IOLTA account to Mr. Scotti. *Id.* at 21–25.

The Court disagrees.

Certainly, a criminal tax defendant has not acted with the requisite willful and knowing intent where he was "merely careless in keeping his books," "made errors of judgment," or "failed to hire a competent bookkeeper or accountant." *United States v. Ruffin*, 575 F.2d 346, 354 (2d Cir. 1978). The Court, however, rejects a defense for each of the three tax years, based upon Mr. Freeman's alleged incompetence, or alleged reliance on tax professionals, in light of the overwhelming evidence of willfulness exhibited at trial, as explained below.

First, viewing the relevant period as a whole, the magnitude of Mr. Freeman's underreporting, over a period of several years, supports a finding of willfulness. *See Koskerides*, 877 F.2d at 1131, 1138 (upholding tax evasion conviction where evidence showed a "pattern of evasion over a three year period," with underreported taxable income of $141,831.44 for 1981, $220,436.45 for 1982, and $300,219.47 for 1983); *United States v. Levy*, 449 F.2d 769, 770 (2d Cir. 1971) (upholding tax evasion conviction where appellant, a "busy attorney" with bookkeeping records that were "informal at best," reported in one tax year "income of $41,388.61 and stipulated at trial that his correct taxable income was $75,432.41" and, in the subsequent tax year "reported income of $29,335 and stipulated at trial that his correct taxable

income was $53,337.45"). Between 2011 and 2013, Mr. Freeman's tax returns understated his taxable income by approximately $950,000.00. *See* GX 7. Each year, the amount underreported was substantial: $276,182.01 in 2011; $166,598.76 in 2012; and $522,836.22 in 2013. GX 7.

In addition, as relevant to all tax years charged in the Indictment, Mr. Freeman had a longstanding record of failure to pay his taxes, dating back to the start of his career as an attorney. Even before the years charged in the Superseding Indictment, Mr. Freeman failed to pay his taxes between 2007 and 2009. Account Trs. 2007, 2008, 2009. Mr. Freeman did eventually pay those overdue taxes in an installment agreement, but only after the IRS began to levy his accounts and force him to pay around June of 2011. *See* GX 1; Account Tr. 2007; Account Tr. 2008; Account Tr. 2009; *see also*, *e.g.*, Account Tr. 2007 at 2 (levy payments on August 12, 2011 and August 16, 2011). This consistent failure to pay taxes supports a finding that Mr. Freeman's violation was willful. *See Bok*, 156 F.3d at 165 (circumstantial evidence that may support a finding that a defendant willfully violated his duty to pay tax may include "the defendant's past taxpaying record").

At trial, the evidence established that Mr. Freeman understood how to interpret his tax returns and did, in fact, review them with care, notwithstanding his use of a tax preparer. IRS Special Agent Hamilton testified that, when she interviewed Mr. Freeman in May of 2018, Mr. Freeman stated that he "would have known if the gross receipts reported on the Schedule C's for his law practice filed with his returns [were] out of line," and further stated that "he would have noticed if the amount of income reported seemed out of line." Tr. 120:18–121:11; *see also* GX 152 ¶ 127. Mr. Freeman confirmed as much at trial, when he testified that he "g[ave] serious thought as to . . . the significance [ ] of the[] various figures" in his 2011, 2012, and 2013 tax returns. Tr. 1283:9–16.

As a result, Mr. Freeman's contradictory comments that, to him, a tax return means "nothing," and might as well be written in "hieroglyphics," are less credible. *Id.* at 1035:24–1036:1. Even if Mr. Freeman did not understand all of the intricacies of the tax code, or how to complete his tax returns without professional assistance, such a significant discrepancy between what he actually earned and what he reported to the IRS—upon even a brief review of the tax return, much less the careful review Mr. Freeman testified that he undertook—was, at the very least, "obvious" to him.[20] *See MacKenzie*, 777 F.2d at 818 n.2 (upholding use of conscious avoidance instruction in false returns case and stating that "[t]he element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him"). This is especially so in light of Mr. Freeman's legal education. *See Gilmartin*, 684 F. App'x at 11 (circumstantial evidence of willfulness includes a defendant's "educational background" (citing *MacKenzie*, 777 F.2d at 818)).

To be clear, the evidentiary basis for convictions on these three felony counts is not based only on a bird's eye view of Mr. Freeman's activities over the course of these three tax years, but also on a close review of Mr. Freeman's activities and knowledge on a tax year-by-tax year basis when he certified these tax returns as true and accurate upon penalty of perjury, as shown below.

### 1. 2011 Tax Year

---

[20] The absence of evidence that Mr. Freeman actively engaged in action to avoid knowledge does not make this inquiry erroneous. Indeed, no such evidence is required for the trier of fact to determine, beyond a reasonable doubt, whether conscious avoidance, in fact, occurred. *United States v. Dambelly*, 714 F. App'x 87, 88 (2d Cir. 2018) (summary order) ("A conscious-avoidance instruction may be given even when the defendant has taken no active measures to avoid learning of criminal activity."); *see also, e.g., United States v. Svoboda*, 347 F.3d 471, 480–81 (2d Cir. 2003) (finding a sufficient evidentiary basis for a conscious-avoidance instruction in facts that do not include any active measures taken by the defendant); *see also United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir. 2014) (Leval, J., concurring) ("A finding that a defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.").

Mr. Freeman did not sign the 2011 tax return until March 12, 2013, almost a full year after the due date of April 15, 2012. GX 26 at 2. When he signed that 2011 tax return—upon penalties of perjury—reporting taxable income of $76,759.00, he had already during that same 2011 tax year submitted a credit application to Ameriprise Financial showing an income substantially higher than what he later reported to the IRS. *Compare* GX 125 (in credit application with Ameriprise Financial signed on May 18, 2011, Mr. Freeman estimates his current, individual annual income as $300,000.00), *with* GX 26 (line 43, 2011 tax return income totaling $76,759.00). Put another way, during the 2011 tax year, Mr. Freeman reported to a finance company an expected annual income of more than three times what he reported to the IRS in actual taxable income.

In addition, just days before Mr. Freeman signed his 2011 tax return in 2013, he filed another credit application for a Ferrari where he projected his annual income as more than five times the annual income reported for 2011. *Compare* GX 131 (on February 25, 2013 lease application for Ferrari, Mr. Freeman represents his "annual salary or wages" as $450,000.00), *with* GX 26 (line 43, 2011 tax return income totaling $76,759.00). Although not directly relevant for purposes of Mr. Freeman's understanding of his 2011 income (as opposed to his 2013 income), this credit application, signed almost contemporaneously with the 2011 tax return demonstrates that, at the time Mr. Freeman signed his 2011 tax return, he had an understanding of his increasing wealth.

Then, in the last month of the 2011 tax year, in December of 2011, Mr. Freeman diverted over $30,000 into the Overstreet Account to avoid levies by the IRS. *See* GX 97 (2011 Overstreet Account statements); GX 98 (Overstreet Account deposits 2011). As he stated at trial, Mr. Freeman did this to ensure that the "IRS could[] [not] take the money." Tr. 1183:12–1184:2;

*see also id.* at 1185:25–1186:20 (Mr. Freeman confirms putting money into the Overstreet Account for "a six-month period . . . to hide it from the IRS"). In short, Mr. Freeman had begun hiding income from the IRS during the 2011 tax year in a deliberate effort to avoid levies by the IRS on his assets and accounts. While the diversion of these funds alone does not mean that Mr. Freeman filed a false return for the 2011 tax year, his actions do undercut Mr. Freeman's main defense against this particular felony charge: his own credibility. Mr. Freeman  expects the Court to believe that he would not have hidden income from the IRS in his 2011 tax return, when he actually hid income from the IRS during the 2011 tax year.

Because there is no record evidence of Ms. Varrs advising Mr. Freeman to start hiding money from the IRS during the 2011 tax year (or any other relevant tax year)—indeed, Ms. Varrs later advised Mr. Freeman to "make payments" to the IRS, DX 540—or to provide potential creditors with an annual income vastly different from the one reported on his 2011 tax return, Mr. Freeman's decisions to do so strongly undercut any argument that, consistent with a reliance defense, he simply followed her advice in good faith. *See United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997) (Reliance on the advice of a professional, offered as a defense, "presupposes the defendant's solicitation of advice in good faith." (citing, *inter alia*, *Williamson v. United States,* 207 U.S. 425, 453 (1908)); *see also United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989) ("Though a defendant who would rely on [a reliance defense] is required to have disclosed all pertinent information in his possession to [the relevant professional], there is no inherent inconsistency between his taking that action and his studious avoidance of gaining other pertinent information." (internal citation omitted)).

As a result, rather than accept Mr. Freeman's *post hoc* explanation at trial of his 2011 earnings, including his less plausible argument that he provided the gross receipts of his law firm

on his 2011 personal credit application rather than his personal income,[21] the Court instead finds

that Mr. Freeman knew his 2011 personal income exceeded the amounts stated on his 2011 tax

return, yet certified to those significantly lower amounts. *See United States v. Rosa*, 17 F.3d

1531, 1542 (2d Cir. 1994) (affirming the prerogative of the "trier of fact" to "decline[] to draw

one of two or more competing inferences"); *United States v. Weichert*, 783 F.2d 23, 25 (2d Cir.

1986) (a verdict will stand if founded upon sufficient evidence, even where the defense

"present[s] innocent explanations" for the alleged misconduct).

Accordingly, in light of all of the above circumstantial evidence, the Government has met

its burden and has proved, beyond a reasonable doubt, that Mr. Freeman signed the 2011 tax

return willfully and knowing it was false, in violation of 26 U.S.C. § 7206(1).

### 2. 2012 Tax Year

Mr. Freeman did not sign his 2012 tax return until December 3, 2013. GX 27 at 2. The

same understanding of his finances, yet willingness to attest to a far lesser amount on his tax

return, continued.

Although Mr. Freeman continued to divert significant funds, hundreds of thousands of

dollars, into the Overstreet account to intentionally evade levies from the IRS in 2012, *see* GX 99

(2012 Overstreet Account Statements); *see also* GX 101 (2012 Overstreet Account Deposits); Tr.

1184:19–1186:16 (testimony by Deron Freeman regarding deposits into Overstreet Account), he

certified only to $64,911.00 in income to the IRS for that tax year, GX 27 (line 43). Meanwhile,

Mr. Freeman's expenditures far outpaced his reported earnings; the evidence at trial showed that,

---

[21] In light of evidence presented at trial, Mr. Freeman's defense that these credit applications reported gross receipts, as opposed to income, falls flat. *See* GX 152 ¶ 127 (statement by Mr. Freeman in an interview with IRS Special Agent Hamilton that he "would have known if the gross receipts reported on the Schedule C's for his law practice filed with his returns [were] out of line", and further stated that "he would have noticed if the amount of income reported seemed out of line"); Tr. 1283:9–16 (testimony by Mr. Freeman that, when making the decision to sign his 2011, 2012, and 2013 tax returns, he "g[ave] serious thought as to . . . the significance [ ] of the[] various figures" in the return).

in 2012, Mr. Freeman spent over two times the amount of income reported on his tax return—$162,490.71—on vehicle-related expenses alone. *Compare id. with* GX 5B (total expenditures for 2011-2016); *see also* GX 5A at 32–67 (Detail of Total Expenditures from People's Personal and Webster Operating Accounts in 2012). This pattern of spending continued and even increased through December of 2013, when Mr. Freeman finally signed his 2012 return under penalties of perjury. *See* GX 5; GX 5B.

Meanwhile, once again, Mr. Freeman's statements of his income to creditors demonstrated that he knew his actual income was substantially higher than reported on his tax returns. Just months before his 2012 tax return was due—and, as noted above, days before Mr. Freeman signed his 2011 tax return in 2013—Mr. Freeman filed a credit application for a Ferrari where he projected his annual income as five times greater than the annual income reported in 2011 or 2012. *Compare* GX 131 (on February 25, 2013 lease application for Ferrari, Mr. Freeman represents his "annual salary or wages" as $450,000.00), *with* GX 27 (line 43, 2011 tax return income totaling $64,911.00). Although not directly relevant for purposes of Mr. Freeman's understanding of his 2012 income (as opposed to his 2013 income), this credit application supports that Mr. Freeman had a clear understanding of his increasing wealth at the time he signed the 2012 tax return under penalties of perjury.

Again, rather than accept Mr. Freeman's *post hoc* explanation at trial of his 2012 earnings and expenditures, as compared with the figures reported in his 2012 tax return, the Court instead finds, based on all of the above evidence, that Mr. Freeman knew his 2012 income exceeded the amounts certified to on his 2012 tax return, yet certified to those significantly lower amounts as income. *See Rosa*, 17 F.3d at 1542 (affirming the prerogative of the "trier of fact" to "decline[] to draw one of two or more competing inferences"); *Weichert*, 783 F.2d at 25 (a verdict will stand

if founded upon sufficient evidence, even where the defense "present[s] innocent explanations" for the alleged misconduct).

Accordingly, in light of all of the above circumstantial evidence, including the evidence specifically noted from the 2011 tax year, *see Gilmartin*, 684 F. App'x at 11 (circumstantial evidence that may support a finding that a defendant willfully violated his duty under the tax laws may include "the defendant's prior taxpaying record" (citing *Bok*, 156 F.3d at 165)), the Government has met its burden and proved, beyond a reasonable doubt, that Mr. Freeman signed the 2012 tax return willfully and knowing it was false, in violation of 26 U.S.C. § 7206(1).

### 3. 2013 Tax Year

Mr. Freeman did not sign the 2013 tax return until October 13, 2014. GX 28 at 2. Once again, Mr. Freeman attested to a far lesser amount of earnings on his 2013 tax return than his spending habits reflected; in 2013, Mr. Freeman's financial records show that he spent over $800,000.00, including over $150,000.00 on vehicles; and, at the time he signed the return in 2014, his spending remained at a similarly high level. GX 5; GX 5B. Meanwhile, Mr. Freeman's statements to creditors again demonstrated knowledge of an earning capacity that did not comport with the amount reported on his tax return, while aligning much more closely with his spending habits and actual income; on July 16, 2014, Mr. Freeman declared his annual salary as $600,000 on an application for credit from Nissan for the purchase of a vehicle. GX 135. This estimation of Mr. Freeman's income far exceeded not only Mr. Freeman's reported taxable income in 2013 of $163,013.00, but also his reported gross receipts of $426,313.00. GX 38. This amount did, however, closely match the actual, unreported taxable income calculated by the IRS for the 2013 tax year: $685,849.22. GX 7.

The Government also produced evidence at trial that Mr. Freeman's tax preparers warned him of potential inaccuracies in his 2013 tax return, further undercutting Mr. Freeman's argument that he did not know the 2013 tax return was inaccurate at the time he signed it. On July 31, 2014, while preparing the 2013 tax return for Mr. Freeman's signature, Ms. Varrs expressed concern about the amount of income reported, when she told Mr. Freeman in an e-mail that she was "[n]ot sure" if the return would be "okay" because Mr. Freeman's income did not exceed $350,000.[22] *See* DX 540. Then, in 2015, Mr. Scotti informed Mr. Freeman that he found it "hard to believe that only 400K was deposited" into Mr. Freeman's IOLTA account in 2013. DX 545. Although Mr. Freeman provided consent for Mr. Scotti to prepare an amended return, *see* DX 546, it was never filed, *see* Account Tr. 2013.

Mr. Freeman's testimony that he signed the 2013 amendment, but Mr. Scotti failed to file it, also is not credible where he later told IRS Special Agent Hamilton in 2018 that he had never filed an amended return, because "he did not have any reason to think he needed to." GX 152 ¶ 121. There is even less reason for the Court to credit Mr. Freeman's testimony that he would have filed an amendment for his 2013 tax return, if not for Mr. Scotti's alleged mistake, when that amendment failed to report approximately $1 million in gross receipts. *See supra* § II.C.3 (the 2013 Amendment).

So, yet again, rather than accept Mr. Freeman's *post hoc* explanation at trial of his 2013 earnings, the Court instead finds that Mr. Freeman knew his 2013 personal income exceeded the amounts certified to on his 2013 tax return, yet certified to those significantly lower amounts as income. *See Rosa*, 17 F.3d at 1542 (affirming the prerogative of the "trier of fact" to "decline[] to

---

[22] The Court rejects Mr. Freeman's interpretation of this e-mail as proving that he had a motive to overstate, rather than understate, his income in order to obtain a mortgage, given his consistent lack of credibility throughout the trial, and in light of his failure to heed the advice of Ms. Varrs in the same e-mail: to "make payments" towards his taxes. DX 540.

draw one of two or more competing inferences"); *Weichert*, 783 F.2d at 25 (a verdict will stand if founded upon sufficient evidence, even where the defense "present[s] innocent explanations" for the alleged misconduct).

As a result, in light of all of the above evidence, including the evidence specifically noted from the 2011 and 2012 tax years, *see Koskerides*, 877 F.2d at 1138 ("pattern of evasion" may serve as circumstantial evidence of willfulness); *Klausner,* 80 F.3d at 63  ("Patterns of understating or failing to report income are also considered evidence of willfulness."), the Government has proven, beyond a reasonable doubt, that Mr. Freeman signed the 2013 tax return willfully and knowing it was false, in violation of 26 U.S.C. § 7206(1).[23]

Accordingly, a verdict of guilty shall enter as to Counts One, Two, and Four.

## B.  Failure to Pay

Mr. Freeman also has been charged with failure to pay tax, in violation of 26 U.S.C. § 7203. Under this federal criminal statute,

> [a]ny person required . . . to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor . . . .

26 U.S.C. § 7203.

The elements of a § 7203 violation are: (1) the defendant had a duty to pay a tax; (2) the tax was not paid at the time required by law; and (3) the failure to pay was willful. *United States v. Tucker*, 686 F.2d 230, 232 (5th Cir. 1982). There is no dispute that Mr. Freeman had a duty to

---

[23] As a final matter, any purported defense based on potential deductions does not change the result. In the case relied upon by Mr. Freeman for this argument, *United States v. Celentano*, 391 F. Supp. 1252 (S.D.N.Y. 1975), the court found the availability of deductions relevant as to the defendant's tax liability for overdue taxes, not as to the issue here: whether Defendant signed a false tax return willfully and knowing it was false, *see id.* at 1253–54.

pay tax and that the tax was not paid at the time required by law. *See* Account Trs. 2012, 2013, 2014, 2015; *see also* Def. Mem. at 29 (conceding that "[o]nly the third element" of the willful failure to pay elements "is at issue in this case"). As a result, only the third element, willfulness, is at issue here.

The willfulness requirement, as used in 26 U.S.C. § 7203, requires "voluntary, intentional" violation of a known legal duty. *Cheek*, 498 U.S. at 200 (citation omitted). In addition to all of the circumstantial factors described in the previous section, as relevant to the felony offenses charged in this case, a defendant's prior taxpaying history is probative in this inquiry. *See United States v. Magnus*, 365 F.2d 1007, 1011 (2d Cir. 1966) ("[P]rior taxpaying history, both federal and state, [is] probative of [a taxpayer's] willfulness in failing to pay substantial amounts of federal taxes . . . .").

In post-trial briefing, the Government first argues that Mr. Freeman's testimony established that his failure to pay was willful, where he knew that he would incur interest and penalties for not paying his taxes on time but failed to pay his taxes regardless. *See* Gov't Mem. at 13 (citations omitted). "That he sometimes chose to 'absorb' late payment penalties[,]" the Government contends, "means that he made a conscious decision not to pay by the date he was required to pay—that is, he voluntarily and intentionally violated a known legal duty," while, instead, "spend[ing] lavishly on himself." *Id.* at 13–15 (citation omitted). The fact that Mr. Freeman now claims that he did not know criminal, as opposed to civil, penalties would result does not mean his failure to pay was not willful, according to the Government. *Id.*

Second, the Government points to Mr. Freeman's approximately decade-long history of failure to pay taxes, dating back to the 2006 tax year, to argue that he engaged in a series of "tactical maneuvers intended to delay or hinder IRS enforcement" and thereby avoid "having to

pay what he owed." *Id.* at 15. In particular, the Government asserts that the history of the IRS levies on Mr. Freeman's accounts, while he continued to receive notice of unpaid tax and ignore contemporary tax obligations, evinces his intent in failing to pay tax. *Id.* at 15–17. The Government also highlights Mr. Freeman's use of the Overstreet Account, in combination with a substantial history of personal spending between 2011 and 2015, as evidence of willful evasion of tax payments. *Id.* at 17–20.

In his defense, Mr. Freeman first argues that he did not understand "late payment of taxes to be a violation of the tax laws[,] as opposed to merely subjecting him to penalties and interest under the Tax Code." Def. Mem. at 30. Further, Mr. Freeman argues that his failure to pay was not willful, where he paid all reported tax obligations for 2011 through 2015 before he was indicted, including over $700,000 in taxes and $90,000 in additional interest and penalties. *Id.* (citations omitted). Mr. Freeman also argues that his communications with Bruce Scotti in 2016 suggest a lack of the requisite intent necessary for the failure to pay taxes counts. *Id.* at 20–21.

Finally, Mr. Freeman argues that the Form 1040 Instructions, which state only that a taxpayer will face interest, fees, and penalties if tax is not paid, support his reasonable understanding of his legal obligations. *Id.* at 31–37. The Government, in his view, has failed to rebut Mr. Freeman's subjective ignorance or misunderstanding of the law. *Id.*

The Court disagrees.

"Willfully" under § 7203 calls only for proof that the taxpayer failed to pay tax "intentionally and knowingly and not through accident or mistake or other innocent cause." *United States v. Platt*, 435 F.2d 789, 795 (2d Cir. 1970) (Friendly, J.). This intent need only exist "with respect to the particular conduct made criminal." *Id.* at 794. As the Second Circuit has acknowledged, this means that in failure to pay cases under § 7203, the requisite *mens rea* for a

civil penalty and a criminal penalty is not distinct, even if the standard of proof differs—

preponderance of the evidence, for a civil penalty, and beyond a reasonable doubt, for a

conviction under § 7203. *Id.*

Certainly, "the offense which the Government decides to prosecute under § 7203 'may be

more grievous than a case for a civil penalty.'" *Id.* (quoting *Spies*, 317 U.S. at 496). This does

not, however, alter the requisite *mens rea* under § 7203. As the Second Circuit has noted,

> A taxpayer going on a spring holiday who knows he has not filed
> the return that will become due on April 15 but intends to and does
> file it in early May, would not be a likely candidate for prosecution
> under § 7203 even though the elements of the offense exist; the
> Commissioner would almost certainly be content with the 5%
> Penalty . . . .  unless the incident was part of a regular pattern of
> disobedience.

*Id.* Here, the circumstances undoubtedly were more grievous than a taxpayer who intentionally

fails to pay income tax due on April 15 due to spring holiday travel. They are even more

grievous than mistakes than one might anticipate from a very overwhelmed attorney or small

business owner.

Between 2012 and 2015, Mr. Freeman made only four voluntary payments to the IRS:

$7,761.00 on August 19, 2013 for the delinquent 2011 tax balance; $5,000 on April 19, 2014 for

the delinquent 2013 tax balance; $11,000 on October 1, 2014 for the delinquent 2012 tax

balance; and $10,000 on June 13, 2015 for the delinquent 2015 tax balance. GX 1 at 2–4;

Account Trs. 2011, 2012, 2013, 2014, 2015. Moreover, the years between 2006 and 2010 are

marked by a history of failure to pay. *See* Account Trs. 2007, 2008, 2009. Further, and most

strikingly, in order to avoid payment to the IRS, Mr. Freeman went so far as to place his assets in

the Overstreet Account, and he freely admitted at trial that the purpose of doing so was to ensure

that the "IRS could[] [not] take the money." Tr. 1183:12–1184:2, *see also id.* at 1185:25–

1186:20 (Mr. Freeman confirms putting money into the Overstreet Account for "a six-month period . . . to hide it from the IRS"); *id.* at 1087:25–1189:20 (additional testimony by Deron Freeman regarding use of the Overstreet Account).

Mr. Freeman's defense that he did not pay based upon the advice of professionals—namely, Mr. Scotti—is unavailing. Since Mr. Scotti did not testify, the defense was presented through Mr. Freeman. For example, Mr. Freeman testified as to the following e-mail exchange with Mr. Scotti on March 17, 2016:

> Mr. Freeman: "Bruce, do you have a transcript of my payments and credits, the Irs [sic] apparently is getting [r]eady to lien an[d] seize. I have some money to send them but I'm not sure for which years I should pay[.]"
>
> Mr. Scotti: "Until we get a registered letter of Notice of Intent to Levy we are ok."

DX 556. By the date this e-mail was sent, Mr. Freeman had already accrued tax liability for the 2011, 2012, 2013, and 2014 tax years for failure to pay.[24] Further, there is no indication in this e-mail exchange that Mr. Freeman actually intended to pay for the upcoming 2015 tax year payment due on April 15, either in part or in full; rather, Mr. Freeman's e-mail indicates that he sought to make a payment to, once again, avoid a levy from the IRS.

---

[24] The same is true for other e-mails in the record between Mr. Freeman and Mr. Scotti concerning Mr. Freeman's payment of tax. *See* DX 557 (e-mail from Mr. Freeman to Mr. Scotti on May 10, 2016 stating: "Bruce I still do not have a response from the IRS regarding the payment plan, is there anyway [sic] you can check on this please?"); DX 558 (e-mail from Mr. Freeman to Mr. Scotti on May 26, 2016 stating: "Bruce, please let me know asap about payment plan, removal of late file fee and I also need 2015 tax returns . . ."); DX 559 (e-mail from Mr. Freeman to Mr. Scotti on June 1, 2016 stating: "Bruce, I have a Drs [sic] bill for 50k, I have no idea what that's from. Also have you made any progress with payment plan? When can I expect 2015 taxes to be done and penalty removed?"); DX 560 (e-mail from Mr. Freeman to Mr. Scotti on June 9, 2016 stating: "Bruce I just got off the phone with the IRS . . . . Can you please help, I am going online now to pay the outstanding balances. They have assigned a field agent apparently but they cannot tell me who. They say the field agent has to establish payment plan. What should I do? Can you help me?"); DX 564 (e-mail from Mr. Freeman to Mr. Scotti on August 23, 2016 asking what he should pay now versus on September 15, 2016).

Mr. Freeman also lacks any defense based on a financial inability to pay. The only evidence that, in any of the tax years charged, Mr. Freeman lacked the financial capacity to pay was a statement to IRS Special Agent Hamilton in the 2018 interview that he did not "put away" money to pay his tax balances, due to "bad bookkeeping." GX 152 ¶ 35. This claim of financial hardship, however, was not substantiated by evidence at trial for 2012, 2013, 2014, and 2015—and, this is hardly surprising, given Mr. Freeman's substantial expenditures in those years. *See supra* §§ II.B.1, II.C.1, II.D.1, II.E.1.

Further, in his testimony, Mr. Freeman admitted that, although he understood he had an obligation to pay tax, he intentionally chose not to do so. *See* Tr. 1050:14–20 (testimony by Mr. Freeman that he sometimes "made the decision to absorb the interest and penalty" and pay taxes late); *id*. at 1363:5–9 (testimony by Mr. Freeman that he believed he "would be penalized with interest only if [he] were late on IRS tax payments and that the penalties for same was just, you know, penalties and interest . . . ."); *see also id*. at 1209:7–16 (Mr. Freeman confirms that no payments were made towards the 2012 tax year at any time around tax due date and that "instead, monies were being used . . . [for] the purchase of [a] Sea-Doo boat, [a] new car, the lease of the Ferrari, [and] the permit to build [ ] new construction at 120 Main Street"); *id*. at 1204:18–23 (testimony by Mr. Freeman that he was "able to pay" the money owed on his 2011 taxes in the 2013 tax year but "didn't"). Mr. Freeman's belief that he could "absorb" the cost of not paying his taxes, for reasons stated above, is no defense. *Id*. at 1050:14–20.

To be clear, as with the felony false returns counts, the evidentiary basis for convictions on these three misdemeanor counts is not based only on an overview of Mr. Freeman's activities over the three-year tax period, but also on a close review of Mr. Freeman's activities and knowledge on a tax year-by-tax year basis, as shown below.

### 1. 2012 Tax Year

Based on the income reported on the 2012 tax return, Mr. Freeman owed $27,736.00 in taxes. Account Tr. 2012. This amount was not paid by April 15, 2013, and, indeed, was not paid until over three years later. *Id.* Although Mr. Freeman's tax return indicated that he made an estimated payment of $10,000, that alleged payment is not reflected in his IRS transcript. *Compare* GX 27 at 2 (line 72), *with* Account Tr. 2012. Indeed, IRS records reflect that Mr. Freeman did not make any estimated payments in 2012 or any payments towards his 2012 tax year balance in the subsequent calendar year.[25] Account Tr. 2012.

This was not the first time that Mr. Freeman had failed to timely pay his taxes. By the due date for Mr. Freeman's 2012 taxes, Mr. Freeman had already received multiple notices from the IRS of unpaid tax for past tax years. *See* Account Trs. 2007, 2008, 2009. While Mr. Freeman did pay off his debt for the 2007 through 2009 tax years, he only did so under an installment agreement with the IRS on September 30, 2011. GX1; Account Trs. 2008, 2009.

At the same time as Mr. Freeman appeared to attempt compliance with the tax code through the installment agreement, he also intentionally hid hundreds of thousands of dollars from levies by the IRS in the Overstreet Account. *See* GX 97 (2011 Overstreet Account Statements); GX 98 (Overstreet Account deposits 2011); GX 99 (2012 Overstreet Account Statements); *see also* GX 101 (2012 Overstreet Account Deposits); *see also* Tr. 1184:19–1186:3 (testimony by Deron Freeman regarding use of Overstreet Account). Although Mr. Freeman testified at trial that he hid these funds from the IRS so that he could keep his business running

---

[25] Mr. Freeman did make a tax payment of $16,000.00 on June 6, 2012, but this payment applied to the delinquent 2009 tax balance. GX 1 at 2; Account Tr. 2009 at 2. In addition, a payment of $7,761.28 on August 19, 2013 went towards Mr. Freeman's delinquent 2011 tax balance. GX 1 at 3; Account Tr. 2011 at 2.

until he was able to pay his taxes, *see* Tr. 1088:6–1089:12, no six-figure payment to the IRS appears in his payment records in 2012 or 2013, *see* Account Tr. 2012; Account Tr. 2013.

Instead, the evidence at trial showed that Mr. Freeman had sufficient funds to pay his taxes in 2012, but instead used those funds to purchase various recreational items. *See* Tr. 1209:7–16 (Mr. Freeman confirms that no payments were made towards the 2012 tax year at any time around the tax due date and that "instead, monies were being used . . . [for] the purchase of [a] Sea-Doo boat, [a] new car, the lease of the Ferrari, [and] the permit to build [ ] new construction at 120 Main Street").

In light of all of the above circumstantial evidence, including the evidence specifically noted from previous tax years, *see Gilmartin*, 684 F. App'x at 11 (circumstantial evidence that may support a finding that a defendant willfully violated his duty under the tax laws may include "the defendant's prior taxpaying record" (citing *Bok*, 156 F.3d at 165)), the Government has met its burden and proved, beyond a reasonable doubt, that Mr. Freeman willfully failed to pay tax in the 2012 tax year, in violation of 26 U.S.C. § 7203.

### 2. 2013 Tax Year

Based on the income reported on the 2013 tax return, Mr. Freeman owed $59,158.00 in taxes. Account Tr. 2013. This amount was not paid by April 15, 2014, and, indeed, was not paid in full until over three years later. *Id.* By the due date for Mr. Freeman's 2013 taxes, he had received multiple notices from the IRS of failure to pay overdue tax. Account Tr. 2007; Account Tr. 2008; Account Tr. 2009; Account Tr. 2011.

Meanwhile, Mr. Freeman's expenditures remained extravagant, indicating availability of funds to timely pay his tax obligation to the IRS. *See* GX 5B. In the four months before the tax due date of April 15, 2014 in particular, Mr. Freeman paid his contractor, Kenneth Sweeney,

$30,000.00. *See* GX 179 at 10–14 (checks to K & S construction in February and March of 2014). Mr. Freeman made no estimated payments, however, in 2013 and, in 2014, paid only $5,000 towards his 2013 tax balance after the tax deadline. Account Tr. 2013.

In light of the above evidence, in combination with evidence noted in the previously charged tax year, *see Gilmartin*, 684 F. App'x at 11 (circumstantial evidence that may support a finding that a defendant willfully violated his duty under the tax laws may include "the defendant's prior taxpaying record" (citing *Bok*, 156 F.3d at 165)), the Government has met its burden and proved, beyond a reasonable doubt, that Mr. Freeman willfully failed to pay tax in the 2013 tax year, in violation of 26 U.S.C. § 7203.

### 3. 2014 Tax Year

For the 2014 tax year, Mr. Freeman owed $151,510.00 in taxes. Account Tr. 2014. This amount was not paid by April 15, 2015, and, indeed, was not paid in full until over two years later. *Id.* In 2014, 2015, and 2016, Mr. Freeman made only one payment of $5,000 towards his 2014 tax obligations—on March 7, 2016, when Mr. Freeman filed the 2014 tax return almost a full year after the due date. *Id.*

At the same time, Mr. Freeman continued to invest hundreds of thousands of dollars in the house at 120 Main Street, rather than pay his tax obligations. *See* GX 1 at 3–4 (summary of 2014 payments); GX 179A (summary of payments to Kenneth Sweeney/K&S Construction from Deron Freeman bank accounts); GX 179C (summary of 120 Main Street expenditures not including payments to Kenneth Sweeney). In the month before the due date for Mr. Freeman's taxes on April 15, 2015, Mr. Freeman spent $20,000 alone on audio equipment and flooring for the house. *See* GX 1 at 4 (summary of 2015 payments); GX 179C (summary of 120 Main Street expenditures not including payments to Kenneth Sweeney).

In light of the above evidence, in combination with evidence noted in the previously charged tax years, *see Gilmartin*, 684 F. App'x at 11 (circumstantial evidence that may support a finding that a defendant willfully violated his duty under the tax laws may include "the defendant's prior taxpaying record" (citing *Bok*, 156 F.3d at 165)), the Government has met its burden and proved, beyond a reasonable doubt, that Mr. Freeman willfully failed to pay tax in the 2014 tax year, in violation of 26 U.S.C. § 7203.

### 4. 2015 Tax Year

For the 2015 tax year, Mr. Freeman owed $266,008.00 in taxes. Account Tr. 2015. This amount was not paid by April 15, 2016, and, indeed, was not paid in full until over two years later. *Id.* That year, in stark contrast to previous years, Mr. Freeman did make three estimated payments; those payments totaled $35,000. *Id.* Mr. Freeman did not, however, pay the remaining balance on the due date in 2016. *Id.*

As in previous years, Mr. Freeman's testimony and spending habits support an inference that, although he had the funds to pay, he instead chose to "absorb" the cost of failing to pay his remaining tax balance on April 15 of the following year, *see* Tr. 1050:14–20; indeed, in both 2014 and 2015, Mr. Freeman's expenditures totaled approximately $2 million, GX 1 at 3–5; *see also* GX 5B (total and sample expenditures for 2011-2016); GX 5A at 96–157 (detail of total expenditures from People's Personal and Webster Operating Accounts).

Mr. Freeman has asked this Court to infer that he lacked the requisite intent from later communications from Bruce Scotti—for example, when, on March 17, 2016, Mr. Freeman sent an e-mail to Mr. Scotti stating that he had "some money" to send to the IRS but was "not sure for which years [he] should pay" in order to avoid another series of liens by the IRS on his assets.

DX 556. In response to this e-mail, Bruce Scotti responded that, "[u]ntil we get a registered letter of Notice of Intent to Levy we are ok." *Id.*

As noted previously, however, there is no indication in this e-mail correspondence that Mr. Freeman intended to timely pay his 2015 taxes, and it was too late for him to timely pay his taxes for any other tax year. Mr. Freeman's testimony to the contrary, *see* Tr. 1065:15–1066:5, given his consistent lack of credibility throughout the trial, does not convince the Court otherwise, *see Rosa*, 17 F.3d at 1542 (affirming the prerogative of the "trier of fact" to "decline[] to draw one of two or more competing inferences"); *Weichert*, 783 F.2d at 25 (a verdict will stand if founded upon sufficient evidence, even where the defense "present[s] innocent explanations" for the alleged misconduct).

Under these circumstances, and for the foregoing reasons, including the evident pattern of Mr. Freeman's failure to timely pay his taxes over a period of years, *Magnus*, 365 F.2d at 1011 ("[P]rior taxpaying history, both federal and state, [is] probative of [a taxpayer's] willfulness in failing to pay substantial amounts of federal taxes . . . ."), the Court finds that the Government has proven beyond a reasonable doubt that Mr. Freeman willfully failed to pay tax in the 2015 tax year, in violation of 26 U.S.C. § 7203.

Accordingly, a verdict of guilty will enter as to Counts Three, Five, Six, and Seven.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds Mr. Freeman **GUILTY** as to all counts.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of April, 2022.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge
