UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim No. 3:19CR220 (VAB) |
| v. | July 21, 2022 |
| DERON FREEMAN | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For the better part of a decade, from at least as early as the 2006 tax year through 2016, IRS Collections tried to get the defendant, Deron Freeman, to accurately report all income and taxes owed and to pay his delinquent taxes by using every enforcement tool in the book. None of those efforts were successful because the IRS lacks the resources to audit each return each year and because the defendant simply didn't want to pay. Even when he said he was going to pay and entered into an installment agreement to do so, he subverted the process by diverting hundreds of thousands of dollars into a nominee account that he kept secret from the IRS. The defendant did so in order to kickstart the construction of his 7,100 square foot luxury home on which he would ultimately spend over $2.5 million, and to have money to spend on fancy cars, boats and motorcycles. Unlike many, the defendant had access to plenty of money and could have accurately reported his taxes and paid his tax balances at any time if he only felt like it. Instead, he filed multiple false returns that materially underreported his income by approximately $950,000 in gross revenue and $357,652 in taxes and refused to pay more than nominal amounts – in fact, failing to pay approximately an additional $662,024 -- until IRS Criminal investigators arrived on the scene.

The defendant now seeks to use the fact that he was ultimately compelled to pay those taxes he had actually chosen to report – ignoring the hundreds of thousands of dollars of revenues and taxes that remained unreported -- as a tactic to reduce his criminal exposure, seeking

1

sentencing credit for paying late under compulsion what most people of lesser means routinely pay on time. But the defendant cannot simply purchase a lower sentence, he must demonstrate that he deserves leniency for his years of willful tax non-compliance and he has failed to do so. He perjured himself repeatedly during trial insisting that his return preparers were at fault, that he didn't know his returns were false, and that he didn't realize he was required to pay his taxes when they were due. Even now, he refuses to admit that his filing of false returns and failure to pay was anything more than a failure to pay careful attention. While on pre-trial supervision, he opened five different credit accounts (including one apparently used to purchase a motorcycle for his 14-year old son's birthday), without notifying Probation, despite a clear condition requiring him to do so. Just months after being admonished for that, he did it again, opening a new account to refinance a car loan. The defendant has conclusively shown that he will ignore any attempt to monitor his finances, whether by IRS Civil, IRS Criminal or the Court.

The United States respectfully submits the following memorandum, to aid the Court in anticipation of the sentencing hearing scheduled for July 28, 2022. For the reasons set forth below, the government asks that the Court adopt the findings of fact and the Sentencing Guideline calculations in the Pre-Sentence Report ("PSR"), and impose a sentence of at least 41 months, consistent with the advisory imprisonment range suggested by the PSR and the Sentencing Guidelines of 41-51 months, an appropriate punishment given detailed and lengthy history of tax non-compliance catalogued at trial and in the PSR.

I.  **PROCEDURAL HISTORY**

Defendant Freeman appeared in the United States District Court at Bridgeport, Connecticut before the Honorable Victor A. Bolden, United States District Judge, on April 18, 2022. On that date the Court issued its Verdict and Special Findings after a six-day bench trial finding Freeman guilty as to all seven counts of the Superseding Indictment as follows:

    Count 1:  Making and Subscribing a False Tax Return (2011) (26 U.S.C. § 7206(1))

    Count 2:  Making and Subscribing a False Tax Return (2012) (26 U.S.C. § 7206(1))

    Count 3:  Failure to Pay Income Tax (2012) (26 U.S.C. § 7203)

    Count 4:  Making and Subscribing a False Tax Return (2013) (26 U.S.C. § 7206(1))

    Count 5:  Failure to Pay Income Tax (2013) (26 U.S.C. § 7203)

    Count 6:  Failure to Pay Income Tax (2014) (26 U.S.C. § 7203)

    Count 7:  Failure to Pay Income Tax (2015) (26 U.S.C. § 7203).

II.    **THE OFFENSE CONDUCT**

The background facts have been detailed in various comprehensive filings at PSR ¶¶ 9-64; the Court's Verdict and Special Findings ("Verdict") (Dkt. 91); the Government's Post-Trial Memorandum (Dkt. 80); and the Government's Reply to Defendant Freeman's Post-Trial Memorandum (Dkt. 84).  Accordingly, the government incorporates those filings by reference without reciting the facts again.

III.    **PENALTIES**

    A.  **Statutory Penalties and Guideline Calculations**

Under 26 U.S.C. § 7206(1), the maximum penalty is three years of imprisonment, up to one year of supervised release, and a $100,000 fine – increased to twice the gross gain or loss pursuant to 18 U.S.C. § 3571, and a mandatory special assessment of $100 on each count.  Under 26 U.S.C. § 7203, the maximum penalty is one year of imprisonment, up to a $25,000 fine, and a mandatory special assessment of $25 on each count.

The PSR calculated the applicable Guidelines as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2T4.1(H)) | 20 |
| <u>Obstruction of Justice (U.S.S.G. § 3C1.1)</u> | <u>+2</u> |
| Total Offense Level: | 22 |

At a Criminal History I, the defendant is subject to an advisory Guidelines imprisonment range of 41 to 51 months.

### B. Restitution

The defendant, through his counsel, has stated his intention to sign the Revenue Agent Report (Form 4549-A) and the Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870) before sentencing, which would avoid the civil side of the IRS relitigating issues, including credits already given the defendant for asserted deductible expenses. The government has not received those signed forms back. In any event, pursuant to the Court's Verdict and Special findings, and the Court's authority to impose restitution under 18 U.S.C. § 3583(d),[1] restitution should be imposed as a special condition of supervised release in the amount of $357,652 to the Internal Revenue Service, IRS – RACS, Attn: Mail Stop 6261, Restitution, 333 W. Pershing Avenue, Kansas City, MO 64108, Ref: Deron Freeman, 3:19cr220 (VAB) (Dist. CT).

## IV. GUIDELINES CALCULATIONS

The section that follows addresses sentencing enhancements recommended by the PSR, specifically: (1) that the defendant's offense level should be increased two levels for obstruction

---

[1] In criminal tax cases, although neither 18 U.S.C. §§ 3663(a) or 3663A provide for restitution in Title 26 offenses, the supervised release statute, 18 U.S.C. § 3583(d), authorizes courts to impose, as a condition of supervised release, "any condition set forth as a discretionary condition of probation in section 3563(b)." Among those discretionary conditions is the requirement that the defendant "make restitution to a victim of the offense . . . (but not subject to the limitation of section 3663(a). . .)." 18 U.S.C. § 3563(b)(2). This broad authority to order restitution as a condition of supervised release without regard to the limitations of § 3663(a), is also recognized in U.S.S.G. § 5E1.1(a)(2) which provides that "[i]n the case of an identifiable victim, the court shall. . . impose a term of probation or supervised release with a condition requiring restitution for the full amount of the victim's loss . . . ."

4

under § 3C1.1; (2) that the defendant should not be given credit for acceptance of responsibility under § 3E1.1(a).

### A.  Obstruction

The Government concurs with the PSR's application of a two-point enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because Freeman's trial testimony reflects that he lied repeatedly under oath.  Under U.S.S.G. § 3C1.1, an obstruction enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  If a defendant gives "false testimony concerning a material matter with the willful intent to provide false testimony," the enhancement applies.  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  In so doing, "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  U.S.S.G. § 3C1.1, App. Note 2.  However, where "numerous witnesses … contradicted [the defendant] regarding so many facts on which [he] could not have been mistaken," an obstruction enhancement applies.  *See Dunnigan*, 507 U.S. at 95-96.

In considering this enhancement, the Court should make clear factual findings for each element of the defendant's perjury, although it is sufficient to make findings that "encompass all of the factual predicates for a finding of perjury."  *Dunnigan*, 507 U.S. at 95; "[B]efore applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Thompson*, 808 F.3d 190, 194-95 (2d Cir. 2015) (per curiam) (internal quotation marks omitted).

"In other words, before imposing the adjustment, the district court must find that the defendant consciously acted with the purpose of obstructing justice." *Id.* at 195 (internal quotation marks omitted). *Compare United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) (ordering remand where sentencing court failed to make sufficient findings under *Dunnigan*, stating only that defendant's trial testimony was "not the truth"); *United States v. Ben-Shimon*, 249 F.3d 98, 103 (2d Cir. 2001) (per curiam) (same). "Although it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding, it is sufficient if the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Thompson*, 808 F.3d at 194 (internal quotation marks and ellipses omitted).

This Court's detailed Verdict and Special Findings well establish all of the elements of perjury as follows:

    **1.**    **The False Return Counts**

Here, the whole of the record leads to the inevitable conclusion that Freeman repeatedly committed perjury at trial. See U.S.S.G. § 3C1.1 application n.4(B). As to the false return counts Freeman made multiple statements that the Court found to be false. For example, Freeman testified that he was disorganized and unable to understand his tax returns and therefore trusted his return preparers to accurately prepare his returns, stating:

- I expected [Ms. Varrs] and trusted her to prepare an accurate return based on her experience which I thought was which I thought at the time was pretty good. Tr. 1035.

- I trusted her. I can look at a tax return and it would mean nothing to me." Tr. 1035.

He insisted that he was unaware of inaccuracies on his returns because he lacked the capacity to understand what was on them, testifying:

- "I trusted [Ms. Varrs] to get everything right to make sure that my returns were prepared accurately because I would have no indication or no reason to know that they were not. Tr. 1035.

- It is like hieroglyphics to me. I remember sending her an email saying that's not my forte. I have some strengths and I clearly have some weaknesses. Those are one of my weaknesses. It is like looking at a paper written in Chinese.  Id.

- I didn't know how to read any of these. This was all -- like I said, this was all kind of hieroglyphics to me. So while I would have looked it over, I would have just trusted what Mr. Scotti did. So I'm sure I would have looked at it, but numbers, gross receipts, Schedule Cs, all of that at the time I had no clue about. I didn't understand what it meant.  Tr. 1330.

When asked by his counsel for all the years in question whether, "at the time you signed each of those documents, did you believe those documents to be false in any material way?" Freeman emphatically testified "Absolutely not."  Tr. 1096.

The Court found these statements to be incredible, stating "[t]he Court, however, rejects a defense for each of the three tax years [subject of a false return count], based upon Mr. Freeman's alleged incompetence or alleged reliance on tax professionals, in light of the overwhelming evidence of willfulness exhibited at trial . . ."  Dkt. 91 at 28. That evidence included the magnitude of Freeman's underreporting (Verdict at 28); Freeman's "longstanding record of failure to pay his taxes" (Verdict at 29); and evidence showing Freeman "understood how to interpret his tax returns, and did, in fact, review them with care, notwithstanding his use of a tax preparer." Verdict at 29.

Freeman also testified repeatedly that the credit applications he completed showing earnings far in excess of what he reported to the IRS did not evidence willfulness and a true

understanding of his yearly earnings, but instead his remarkable belief that the applications called for gross receipts of his law firm, rather than his net profit (or annual salary). He testified:

- When the Ferrari credit application asked for "annual salary or wages" and he put $450,000, that he thought they were asking for "gross firm receipts." Tr. 1091, 1288.

- When filling out the credit applications he thought creditors wanted him to list gross receipts of his law firm. Tr. 1285.

- When Ameriprise asked for "individual annual income," and he put 300,000, he thought they were asking for gross receipts for the firm. Tr. 1286.

- I put business gross receipts on all of them and they all matched up. So that's what I did. Tr. 1289. See also Tr. 1289 (Freeman testifying that he believed the Jeep application was calling for gross receipts from the Schedule C, not gross income from the first page of the Form 1040); Tr. 1289 (Freeman testifying that where Nissan application called for "salary annually," he believed it called for gross receipts of his law firm.

The Court rejected this testimony *in toto*, concluding that during the 2011 tax year, Freeman reported to a finance company (Ameriprise) an expected annual income of more than three times what he reported to the IRS in actual taxable income (Verdict at 31) and that "just days before Mr. Freeman signed his 2011 tax return in 2013, he filed another credit application for a Ferrari where he projected his annual income as more than five times the annual income reported for 2011." *Id.* In addition, the Court found that Freeman's December 2011 diversion of over $30,000 into the Overstreet account "in a deliberate effort to avoid levies by the IRS" undercut his main defense against the felony charges, namely, "his own credibility." Verdict at 32. Further, because there was no evidence of Ms. Varrs (or anyone else) ever advising Freeman to hide money from the IRS in the Overstreet account during 2011 (or any other year), the Court rejected any argument that Freeman relied on anyone else's advice to do so. Verdict at 32. The Court

concluded that "Mr. Freeman knew his 2011 personal income exceeded the amounts stated on his 2011 tax return, yet certified to those significantly lower amounts." Verdict at 33.

During the 2012 tax year, the Court noted that Freeman continued to divert hundreds of thousands of dollars into the Overstreet account to intentionally evade IRS levies and engaged in spending that "far outpaced his reported earnings," spending over two times the amount of income reported on his tax return on vehicle-related expenses alone. Verdict at 33. Meanwhile, as in 2011, Freeman's statements to creditors (including to Ferrari) where he projected his annual income as five times greater than the income he reported in 2011 or 2012 showed that he had a clear understanding of his increasing wealth at the time he signed the 2012 return. The Court also rejected Freeman's "*post hoc* explanation at trial of his 2012 earnings and expenditures, as compared with the figures reported in his 2012 tax return" and instead found that "Mr. Freeman knew his 2012 income exceeded the amounts certified to on his 2012 tax return, yet certified to those significantly lower amounts as income." Verdict at 34.

For the 2013 tax year, again, the Court rejected Freeman's *post hoc* explanation at trial of his 2013 earnings, instead finding that Freeman knew his 2013 personal income exceeded the $163,013 in taxable income (and $426,313 in gross receipts) he reported on his tax returns. Evidence at trial showed that in 2013, Freeman spent over $800,000, and maintained a similarly high level of spending in 2014 – the year in which he signed the 2013 return. Verdict at 35. Meanwhile however, Freeman told creditors, including Nissan, that his annual salary was $600,000, an amount much more closely aligned with what the IRS calculated. *Id.*

The Court also noted that Freeman's return preparers warned him of potential inaccuracies in his 2013 return, that Mr. Scotti prepared an amended return, but it was never filed. The Court flatly rejected Mr. Freeman's testimony that he signed the amendment but that Mr. Scotti failed to file it because Freeman himself told the case agent during an interview in 2018 that he had never

9

filed an amended return because "he did not have any reason to think he needed to" and because even the amendment failed to report over $1 million in gross receipts. Verdict at 36.

### 2. The Failure to Pay Counts

Similarly, for the failure to pay counts, the defendant testified that he didn't think he was doing anything wrong in paying late, that his failure to pay was not willful where he paid all his tax obligations for 2011 through 2015 before he was indicted. *See, e.g.,* Tr. 1050 ("Q. Was it your intent by failing to pay in a timely fashion quarterlies, was that in any way an attempt to circumvent your obligation to delay the payment of taxes for periods of time in which you earned income? A. Never. There was my business had ebbs and flows. It was chaotic at best. It was difficult sometimes. It was never my intention not to pay but sometimes you would have to keep reserves for cases for clients, but it was never my intention not to pay. Sometimes I made the decision to absorb the interest and penalty.")

The Court rejected these arguments in light of Freeman's long history of non-payment even in the face of multiple notices, and his deliberate diversion of assets to a nominee account in order to ensure that the "IRS could[] [not] take the money." Verdict at 7, 31, 40. The Court expressly rejected Freeman's testimony that he did not pay based upon the advice of Mr. Scotti because the email on which Freeman relied was sent when he had already failed to pay tax years 2011, 2012, 2013, and 2014; there was no indication that Freeman actually intended to pay for the 2015 tax year either; and Freeman's "consistent lack of credibility throughout the trial does not convince the Court otherwise." Verdict at 41, 47.

In finding the defendant guilty on all seven charged counts, the Court necessarily concluded that the defendant repeatedly testified falsely about his state of mind. Indeed, had the Court believed the defendant's repeated statements that his returns were simply inaccurate because he "relied" on return preparers, or "didn't pay attention," or that tax returns were "hieroglyphics,"

or that he simply didn't understand them, it would have acquitted Freeman of one or more of the charged counts. Instead, the Court specifically found the defendant showed a "consistent lack of credibility" in the face of "overwhelming evidence of willfulness exhibited at trial. Verdict at 28, 36 n.22, 47.

There is no dispute that the subject of Freeman's false testimony (*i.e.,* whether he filed false returns and failed to pay willfully) was material. Indeed, Freeman's entire defense revolved around the issue.

Nor is there any dispute that Freeman's testimony was intentional. He testified only after his counsel and the Court advised him that he was not required to testify, that only the Government had an obligation to prove his guilt, and that the Court would not draw any negative inference from his decision not to testify. Tr. at 978-79. Freeman has never claimed that this testimony was the result of confusion, mistake, or faulty memory. Even now, Freeman continues to insist that he simply didn't notice that his returns were false, saying that he was "nonchalant in [his] dealings with [his] tax obligations," that he "failed to sit down and regularly examine each tax return" before signing it, that he "did nothing to ensure their accuracy," and that he "passed on [his] responsibilities to the various individuals who assisted in preparing [his] taxes." PSR ¶ 71. Freeman intentionally provided this false testimony at trial (and, in fact, continues in an effort to deceive the Court with his present protestations of negligence), and a two-point enhancement for obstruction is warranted. See U.S.S.G. 3C1.1 application n.4(b).

### B.     Interest and Penalties

Freeman argues that interest and penalties should not be included in loss because he made payments against his delinquent tax balances before he was indicted or contacted by the IRS. Def. Memo. at 3. Freeman emphasizes that this result promotes sound public policy in order to "encourage people, albeit late, to pay their taxes" and that if you do not receive credit for paying

11

once IRS-CID "shows up on one's doorsteps" that "an important incentive to pay is absent." *Id.* Freeman's request for "credit" for making tardy payments under threat of a criminal investigation should be rejected.

If a taxpayer owes tax and fails to file or pay on time, federal law requires interest and penalties to be assessed. See 26 U.S.C. § 6651 (requiring penalties for failure to file return and pay tax); § 6601 (requiring interest on tax delinquencies). Once those amounts are assessed, they become part of the "tax" owed and are added to the taxpayer's bill. 26 U.S.C. § 6651 (stating penalties for failure to file or pay "shall be added to the amount . . . shown as tax . . ."); § 6601 (requiring interest on taxes not paid to be treated as tax). Interest continues to accrue on the total amount of that "tax" (at a statutorily determined rate) until the debt is paid in full. 26 U.S.C. § 6621 (defining interest rate).

Although tax penalties and interest are generally not part of the tax loss calculation for evasion of assessment or false return offenses, the Guidelines provide that interest and penalties *are* included "in willful evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203." U.S.S.G. Section 2T1.1 App. Note 1. In determining "tax loss," the Guidelines direct a sentencing court to look to the object of the offense and "[i]f the object of the offense is to avoid the tax, penalties, and interest, then penalties and interest should be included in the tax loss." U.S.S.G. § 2T1.1(c)(1); *United States v. Adams*, 955 F.3d 238, 248 (*quoting United States v. Black,* 815 F.3d at 1055 815 F.3d 1048, 1055 (7th Cir. 2016)). Indeed, interest and penalties are appropriately included in tax loss, even where the defendant has not been convicted of either a willful evasion of payment or a willful failure to pay, so long as the object of the offense was to avoid paying them. *See Adams*, 955 F.3d at 248-49 (interest and penalties on unpaid tax may be included in tax loss computation based on uncharged relevant conduct constituting either a willful evasion of payment or willful failure to pay).

Here, the object of Freeman's willful failure to pay was to avoid paying not only the original tax due, but also the assessed interest and penalties. He was well aware that interest and penalties were being assessed as he was repeatedly notified of that fact by dozens of IRS notices and he acknowledged "absorbing" the interest and penalties. Yet, he willfully failed to pay what he owed in any event. Allowing him to exclude interest and penalties from his tax loss computation on these facts would allow a criminal tax defendant with financial means to wait until IRS Criminal started a criminal investigation and then buy his way to a lower sentence by paying down what he knew he owed and should have paid years earlier.[2] Interest and penalties are appropriately included in tax loss here and correctly calculated in the PSR.

## V.     Section 3553(a) Factors

The seriousness of the criminal offense must be considered first among the § 3553 factors; indeed, it is the first goal of the criminal justice system listed in § 3553(a)(2). The magnitude of Freeman's tax offenses (involving over $1 million in tax loss), and the duration of his noncompliance render this case a particularly serious tax matter.

---

[2] The growing stridency from IRS collection as to the Freeman's accounts coupled with the steps taken by IRS criminal against Freeman's brother plainly focused Freeman to pay the reported taxes, penalties and interest, if only to forestall criminal investigation into his finances or to stop accruing interest and penalties, but such payment in no way mitigates his conduct. In fact, a defendant's notice of an impending IRS criminal investigation is simply not relevant to the "tax loss" determination in a tax case, as, by that point, the crime of failing to pay the entire tax loss, penalties, and interest has taken place. A defendant's argument that their tax loss "should have been reduced by the amount of [their] late payments" is insufficient because after the "point the offense had been committed[, s]ubsequent payments cannot retroactively reduce that tax loss." *United States v. Lynch*, 735 F. App'x 780, 793 (3d Cir. 2018). "[S]ubsequent payment by [defendant] or a third-party of the tax fraud loss would not have diminished the loss for sentencing purposes." *Gerardo v. United States*, No. 98-3610, 1999 WL 528093, at *2 (7th Cir. July 20, 1999).

Promoting respect for the law is also critical here. First, in the eyes of the average citizen, the magnitude of this tax case is considerable, and punishment should be proportionate to the offense. Second, the defendant was a highly successful, licensed attorney who knew better than anyone what the tax laws required, especially given his years of experience with IRS Collections. That he chose to do otherwise despite his knowledge and expertise, is noteworthy. Finally, the means the defendant used to execute his tax offenses, namely, repeated filings of false tax returns, years of willful failure to pay despite tremendous efforts by the IRS, use of a nominee account to hide money from the IRS, and resorting to false testimony at trial in an attempt to avoid the consequences of his actions, shows a deep commitment to criminality and indifference to the truth. This highlights the acute need for the sentence here to promote respect for the law.

General deterrence is an especially important goal in sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare. *See United States v. Park*, 758 F.3d 193, 201 (2d Cir. 2014) ("[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines."). The sentence here should serve as a clear message to others who may be tempted to cheat the IRS when they think that no one is looking.

Finally, just punishment also weighs in favor of a significant sentence. The defendant grew up in a loving environment with the support of both parents, earned a college degree, a law degree, and ran a highly successful law practice. He was not suffering any financial distress when he undertook this tax scheme, to the contrary, he enjoyed a financial largess that most can only dream about. He well could have afforded an abundant lifestyle and still paid his taxes, but he decided instead to fund extravagances out of greed.

Although he claims to have mended his ways, seeing now "upon reflection" that he was "intoxicated" with money "back then" (in 2010, 2011, 2012, 2013), his conduct shows a continued

disdain for any rules regarding his money. His conditions of release plainly stated that he "[n]ot open or authorize opening of any new bank or credit account over which he has access or control without notifying probation," but he did so anyhow, and repeatedly so. He opened five separate accounts, on April 16, 2020; May 27, 2020; October 2, 2020; October 28, 2020; and August 19, 2021, including one to buy a Kawasaki motorcycle for his 14-year old son's birthday. PSR ¶¶ 4-7. Probation admonished Freeman to abide by this clear condition of supervision and he promised to be better, but less than six months later, he did it again. On May 16, 2022, Freeman opened an American Eagle Financial Credit Union account in order to refinance a large car loan without bothering to notify Probation. Dkt. 108. His continued disregard of a simple notice requirement highlights his disdain for any restrictions on his finances – by IRS Civil, IRS-CID, or the Court.

The defendant does not appear to have accepted responsibility or even acknowledged his guilt in any meaningful way. To the government's knowledge, he has not made or attempted to make any restitution payments for delinquent liabilities dating back to the 2011 tax year. Even now, the defendant maintains that his tax crimes were the result of a lack of care ("I was much too nonchalant"; defendant "failed to give the necessary time and importance to paying his tax obligations quarterly") and that it wasn't until after the trial that he realized what he had done. That defendant cannot acknowledge what the trial evidence established beyond a reasonable doubt, namely, that he intentionally and willfully filed false returns and knew he was doing so at the time he signed the returns, and that he intentionally and willfully failed to pay taxes he knew he owed. His continued insistence that this was all some sort of mistake on his part weighs heavily in favor of a more severe sentence.

## CONCLUSION

The government believes that a sentence within the advisory Guidelines range of 41 to 51 months gets it right in this case, given the scope and extent of the defendant's criminal conduct in this case and the goals of sentencing.

        Respectfully submitted,

        VANESSA ROBERTS AVERY
        UNITED STATES ATTORNEY

        /s/   *Susan L. Wines*
        SUSAN L. WINES
        ASSISTANT UNITED STATES ATTORNEY
        Federal Bar No. phv2379
        157 Church Street
        New Haven, Connecticut 06510
        Tel. (203) 821-3700
        susan.wines@usdoj.gov

        */s/ Christopher W. Schmeisser*
        CHRISTOPHER W. SCHMEISSER
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. ct14806
        christopher.schmeisser@usdoj.gov
        157 Church Street, 25th Floor
        New Haven, CT  06510
        Tel.: (203) 821-3700
        Fax: (203) 773-5377

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Susan L. Wines

_____

SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY